# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

CORNEL WEST AND MELINA ABDULLAH, GERALDINE TUNSTALLE, KATHERINE HOPKINS-BOT, AND CHARLES HIER,
Appellants,

v.

PENNSYLVANIA DEPARTMENT OF STATE AND AL SCHMIDT, IN HIS CAPACITY AS SECRETARY OF THE COMMONWEALTH,
Appellees

Appeal from the United States District Court for the Western District of Pennsylvania, No. 2:24-CV-01349 (Hon. Nicholas Ranjan)

## APPELLANTS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

Matthew H. Haverstick (No. 85072)
Shohin H. Vance (No. 323551)
Samantha G. Zimmer (No. 325650)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
svance@kleinbard.com
szimmer@kleinbard.com

J. Andrew Crompton (No. 69227)
Erik Roberts Anderson (203007)
Ryan T. Gonder (No. 321027)
Matthew L. Hoke (No. 331634)
McNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
Ph: (717) 232-8000
Eml: dcrompton@mcneeslaw.com
eanderson@mcneeslaw.com
rgonder@mcneeslaw.com
mhoke@mcneeslaw.com

*Attorneys for Appellants*

# TABLE OF CONTENTS

I. STATEMENT OF FACTS .................................................................. 1

   A. Candidates' Nomination Papers and the Complaint ....................... 1

   B. District Court Proceedings ............................................................. 3

II. ARGUMENT ................................................................................... 7

   A. Because Appellants are likely to succeed on the merits of their
   appeal, they are entitled to an injunction pending appeal. ............ 8

      1. Because the injunction sought by Appellants would not have
      affected election rules and did not entail risk of confusion,
      *Purcell* did not militate against injunctive relief ....................... 9

      2. District Court's specific findings did not justify relief under
      *Purcell*. ...................................................................................... 13

   B. Without injunctive relief, Appellants face irreparable harm ........ 21

   C. The balance of harms weighs decisively in favor of granting an
   injunction pending appeal ............................................................. 23

III.   CONCLUSION .............................................................................. 26

# I. STATEMENT OF FACTS

## A. Candidates' Nomination Papers and the Complaint.[1]

On July 11, Cornel West and Melina Abdullah (Candidates)—the nascent "Justice for All" (JFA) party's nominees for President and Vice-President in the 2024 General Election respectively—submitted their candidate affidavits and Nomination Papers with Appellees. The Nomination Papers were signed by over 13,000 registered Pennsylvania voters, including Appellants Geraldine Tunstalle, Katherine Hopkins-Bot, and Charles Hier (Voters). Appellees, however, refused to accept and certify Candidates' Nomination Papers unless and until each of the nineteen individuals designated as presidential electors therein submitted separate "candidate affidavits." According to Appellees' interpretation of Section 951 of the Election Code, every individual designated as a presidential elector by JFA is a "candidate for public office" and, thus, must submit a candidate affidavit and otherwise comply with the statutory requirements applicable to candidates for public office. 25 P.S. § 2911. The upshot of Appellees' interpretation was that Candidates were required not only to list all nineteen presidential

---

[1] Unless otherwise stated, all references to dates are presumed to be in 2024.

electors on their Nomination Papers before they could even begin gathering signatures, but also to submit candidate affidavits from that specific slate of electors by the August 1 deadline for filing nomination papers.[2] By late July, however, it became increasingly clear that Candidates would be unable to timely file affidavits from each of the nineteen individuals they originally listed as presidential electors; consequently, their Nomination Papers were rejected and returned on August 6.

On August 15, several JFA electors commenced an action in the Commonwealth Court of Pennsylvania to compel acceptance of Candidates' Nomination Papers. *See Williams v. Pennsylvania Dep't of State*, 394 M.D. 2024 (Pa.Cmwlth.). On August 23, Commonwealth Court denied relief based on laches, which the Pennsylvania Supreme Court affirmed *via* a single-sentence *per curiam* order. *See Williams v. Pa. Dep't of State*, 25 WAP 2024 (Pa. Sept. 16, 2024).

---

[2] As detailed in Appellants' filings below—and noted by District Court—the requirements relative to the presidential candidates of the major political parties are markedly less restrictive.

Thereafter, on September 25, Appellants filed a verified complaint in this matter, alleging that Appellees' interpretation of Section 951, as applied to them, violates the First and Fourteenth Amendments to the United States Constitution and, simultaneous therewith, lodged a preliminary injunction motion seeking an order directing Appellees to accept the Candidates' Nomination Papers and certify their names for inclusion on the ballot in November.

## B. District Court Proceedings.

On October 7, District Court held a hearing on Appellants' request for injunctive relief, during which it heard testimony from Dr. West and Jonathan Marks, the Department's Deputy Secretary of Elections. *See* Oct. 7 Hr'g Tr., attached as Exhibit A.

Dr. West eloquently testified about the pervasive obstacles to ballot access political bodies like JFA face. Further, relative to Pennsylvania, Dr. West specifically further explained the difficulties JFA faced with identifying electors so early in the process and complying with Appellees' interpretation of Section 951.

Appellees presented testimony from Marks, who generally described the procedures and tasks that county boards of election must

3

complete before every election, including proofing/printing ballots and testing voting machine. According to Marks, after the candidates are certified, the sixty-seven counties work with their respective vendors to proof/print ballots and test voting equipment. *Id.* at 42-43.

Specifically, Marks' testimony focused largely on logic and accuracy testing (L&A), which he claimed could take up to a week to complete, depending on the size of the county and whether it uses a ballot marking device as its primary method of voting on election day. *Id.* at 49-53. Here, Marks' only guidepost was that it took Philadelphia a full week to complete its L&A; however, no further context was offered in this regard. Marks also agreed it was possible that some counties may be able to accommodate any late changes to the ballot more easily. *Id.* at 65, 67.

As for printing paper ballots, Marks testified that the process for printing election day ballots had begun and that he was "not confident" they could be reprinted now. *Id.* at 59:6. But Marks expressly stated that "[w]ithout asking the vendors that question," *id.* at 68:20-23, he "just [didn't] know the answer to that question." *Id.* at 69:5-6. Marks also agreed that "late changes to ballots are common," and had

"occurred multiple times," including in 2016, when a candidate for U.S. Senate was ordered on the ballot one week before the election. *Id.* at 63:22-64:8.

He could not precisely testify as to where each of the counties were in the ballot printing or L&A, only focusing on Allegheny and Philadelphia counties. *See id.* at 65, 67. In short, aside from stating the fairly obvious—that the paper ballots cannot be printed at any local print shop—Marks couldn't speak with any degree of specificity about printing difficulties. *See id.* at 69:7-70:19. Marks did not testify how long it would take if all counties were required to re-print ballots.

And in any event, Marks agreed that, even if certain counties printed ballots before the issuance of an injunction, they could post notices at polling places on election day to alert voters that Dr. West is a candidate—**as "has been done before."** *Id.* at 73:1-5 (emphasis added).

Late in the evening on October 10, the District Court issued a Memorandum Order, attached as Exhibit B, denying the injunction. Importantly, the Court agreed that Appellants are "clearly likely to succeed on the merits" of their constitutional claim and expressed

"serious concerns with the Secretary's application of the election code's restrictions to Dr. West" because it "appear[s] to be designed to restrict ballot access to him (and other non-major political candidates) for reasons that are not entirely weighty or tailored, and thus appear to run afoul of the U.S. Constitution." *See* Ex. B at 1. The Court also agreed that "[Appellants] have unquestionably suffered irreparable harm, because the loss of First Amendment rights constitutes irreparable harm." *Id.* at 4.

Nevertheless, relying on the *Purcell* principle, which counsels caution in the election context, the Court denied relief and specifically "ma[de] three findings in this regard[:]" (1) the proximity of the election, (2) risk of error and confusion associated with a late change to the ballot; and (3) the Pennsylvania Supreme Court's refusal to change rules governing canvassing of mail-in ballots at such a late juncture. *Id.* at 7-10 (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)).

Appellants appealed and sought an injunction pending appeal, which the District Court denied, largely for the same reasons it had articulated before. *See* Exhibit C.

## II.    ARGUMENT

When considering a request for an injunction pending appeal, this this Court must balance and "consider the relative strength of four factors[:]" (1) likelihood of success on the merits of the appeal; (2) irreparably injury absent immediate relief; (3) balance of equities; and (4) the public interest. *In re Revel, AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015).

Explaining the proper interplay between these factors, this Court has emphasized that the first two prongs—while not dispositive—are the "most critical." *Id.* Thus, under this Court's "'sliding scale' approach," *id.*, "the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor[.]" *In re A & F Enterprises, Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014) (cleaned up). Finally because the final two factors "merge when the Government is the opposing party[,]" the final analysis focuses on the balance of equities. *Nken v. Holder*, 556 U.S. 418, 435 (2009)

Applying the above principles, this Court should have little difficulty concluding that Appellants are entitled to an injunction pending appeal in this matter. Indeed, as developed below, the only

genuine question centers on *Purcell*—namely whether it was properly

construed to deny relief in the proceedings below, and whether it

precludes relief now. But a careful review of *Purcell* and the attendant

jurisprudence shows that it is presently inapplicable (or, at most, only

minimally relevant). And with a proper understanding of *Purcell* and its

contours, Appellants' right to an injunction pending appeal is

essentially a foregone conclusion—particularly in view of the "sliding

scale" approach adopted by this Court.

### A. Because Appellants are likely to succeed on the merits of their appeal, they are entitled to an injunction pending appeal.

In order to obtain a preliminary injunction in the proceedings

below, Appellants had the burden of establishing the same factors

required for injunctions pending appeal—*i.e.*, likelihood of success on

the merits of the constitutional claim, irreparable harm absent relief,

and balance of harms warrants an injunction. With regard to the first

factor, Appellants' likelihood of success on the merits of their

underlying constitutional claim is—as the District Court correctly

concluded—"indisputably clear." Similarly, as the District Court

acknowledged, the second prong is also easily satisfied, since

Appellants' "have unquestionably suffered irreparable harm[.]" Ex. B at 6. This leaves only the third factor—whether the balance of harms weighed against an injunction. And at first blush, this inquiry, in light of *Purcell*, appears to be a somewhat closer call. But ultimately, a careful review of the relevant authorities shows that District Court's examination of the competing interests is predicated on a mistaken view of *Purcell*. Thus, the District Court erred when it denied relief.

> **1. Because the injunction sought by Appellants would not have affected election rules and did not entail risk of confusion, *Purcell* did not militate against injunctive relief.**

Because *Purcell* has been (erroneously) transformed into the lynchpin of this case, it is helpful to briefly analyze the underlying principles articulated in that decision.

At is core, *Purcell* stands for what should be an unremarkable (if not self-evident) proposition:  courts should "weigh considerations specific to election cases, in addition to the traditional considerations for injunctive relief." *Kim v. Hanlon*, 99 F.4th 140, 160 (3d Cir. 2024) (cleaned up). Indeed, notwithstanding District Court's suggestion to the contrary, "[t]he *Purcell* principle is not new[,]" *Pierce v. N. Carolina State Bd. of Elections*, 713 F.Supp.3d 195, 242 (E.D.N.C. 2024), and,

"instead, is steeped in a line of cases going back to the 1960s[.]"[3] *Purcell*, therefore, merely cautions courts to remain mindful that the realities of the election process are such that, *sometimes*, an injunction aimed at vindicating the rights of voters can have the opposite effect.

Recognizing that *Purcell* should not be rigidly applied, this Court recently cautioned that "*Purcell* is a consideration, not a prohibition[.]" *Kim*, 99 F.4th at 160.[4] And because its chief focus is "on avoiding election issues that could lead to voter confusion shortly before an election[,]" absent a persuasive showing of widespread confusion "and consequent incentive to remain away from the polls[,]" *Purcell* is not a proper basis for withholding relief. *Id.* (cleaned up). Indeed, *Kim* isn't alone in observing that *Purcell*'s is principally concerned with avoiding voter confusion. *See, e.g.*, *Voto Latino v. Hirsch*, 712 F.Supp.3d 637, 681 (M.D. N.C. 2024); *VoteAmerica*, 609 F.Supp.3d at 1369; *A. Philip*

---

[3] Harry B. Dodsworth, *The Positive and Negative Purcell Principle*, 2022 Utah L. Rev. 1081, 1127 (2022).

[4] Other courts are in accord that *"Purcell* is not an absolute principle." *La Union Del Pueblo Entero v. Abbott*, __F.4th__, __, 2024 WL 4487493, at \*3 (5th Cir. Oct. 15, 2024); *VoteAmerica v. Raffensperger*, 609 F.Supp.3d 1341, 1368 (N.D. Ga. 2022).

10

*Randolph Inst., of Ohio v. LaRose*, 493 F.Supp.3d 596, 615 (N.D. Ohio 2020).

Moreover, the few Courts that have applied *Purcell* in the absence of a specific showing of confusion that disincentivizes voting, have nevertheless emphasized that its prudential bar is generally implicated only where the eleventh-hour change in election rules could have a deleterious impact on the right to exercise the franchise.[5] In other words, *Purcell* applies when courts are asked to interfere with election processes and procedures governing the mechanisms of an election.

But late changes to include (or exclude) a candidate from the ballot are not changes to election procedure covered by *Purcell*.[6] Indeed,

_____

[5] *See, e.g.*, *Get Loud Arkansas v. Thurston*, __F.Supp.3d__, __, 5:24-CV-5121, 2024 WL 4142754, at *23 n.24 (W.D. Ark. Sept. 9, 2024) ("*Purcell* is not at issue where, . . . the preliminary injunction does not fundamentally alter the nature or rules of the election, create voter confusion, or create an incentive for voters to remain away from the polls[.]" (internal quotation marks omitted)); *Curling v. Kemp*, 334 F.Supp.3d 1303, 1326 (N.D. Ga. 2018) (focusing inquiry on "how injunctive relief at this eleventh-hour would impact the public interest in an orderly and fair election, with the fullest voter participation possible and an accurate count of the ballots cast." (emphasis added)).

[6] *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423 (2006) (extending absentee ballot deadlines); *La Union Del Pueblo Entero*, __F.4th at__, 2024 WL 4487493 at *3 (ballot handling rules); *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 679 (11th Cir. 2020) (extension of mail-in ballot deadlines).

in delineating *Purcell*'s contours, a number of courts have emphasized

that *Purcell* is not implicated merely because an injunction pertains to

an election; rather, it only applies where the injunction would change

election rules or procedures. *See, e.g.*, *Bryan v. Fawkes,* 61 V.I. 416, 469

(V.I. 2014) (granting relief and distinguishing *Purcell* because it "did

not involve challenges to a candidate's access to the ballot, but instead .

. . large-scale changes to the election process itself that affected both

voters and poll workers"); *Democratic Cong. Campaign Comm. v.*

*Kosinski*, 614 F.Supp. 3d 20 (S.D. N.Y. 2022) (determining *Purcell* did

not bar injunctive relief for curing absentee ballots because it does not

alter any "'voter-facing aspects of the upcoming elections").[7]

---

[7] *Nat'l Ass'n for Advancement of Colored People , Spring Valley Branch v. E. Ramapo Cent. Sch. Dist*., 464 F.Supp.3d 587, 590 (S.D.N.Y. 2020) (rejecting "concerns that the injunction will disrupt the election process, create confusion and delays, pose administrative challenges, and cause waste" because *Purcell* and its progeny involved "circumstances risking voter confusion or involving ***complicated changes in voting procedures***").

District Court's holding that Appellants' construct of *Purcell* is "too narrow" is not grounded in the caselaw. Ex. B. at 10. District Court was, of course, correct that "[c]ourts have characterized many election-related provisions as 'election rules' subject to *Purcell*[,]" *id.* at 10 (quoting *Tennessee Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Lee*, 105 F.4th 888, 897 (6th Cir. 2024)). But *Lee* itself characterized the threshold inquiry as "Did the district court's injunction change an 'election rule[ ]' within the meaning of *Purcell*?"

In short, the authorities firmly establish that "*Purcell* is not a

magic wand that defendants can wave to make any unconstitutional

election restriction disappear so long as an impending election exists."

*People First of Ala. v. Sec'y of State for Ala.*, 815 F. App'x 505, 514 (11th

Cir. 2020) (Rosenbaum, R., and Pryor, J., concurring). And it certainly

"does not **command** judicial abstention in late-breaking election cases."

*Harding v. Edwards*, 484 F.Supp.3d 299, 318 (M.D. La. 2020) (emphasis

added)).

## 2. District Court's specific findings did not justify relief under *Purcell.*

Against this backdrop, District Court's erred in its conclusion that

*Purcell* "weighs strongly in favor of denying injunctive relief." Each of

District Court's three findings in this regard are addressed in turn.

---

*Id.* And the fact that "injunctions imposing new congressional maps[,]"
Ex.B. at 10., have been subject to *Purcell* is hardly surprising, given
that the implementation of new districts inevitably means that
thousands (if not millions) of voters must familiarize themselves with
their new legislative districts and the candidates running to represent
them. The confusion in such circumstances is, therefore, palpable.
Indeed, as noted above, the decades-old caselaw on which *Purcell* is
predicated, includes *Reynolds v. Sims*, which involved a late-breaking
challenge to a legislative reapportionment plan. 377 U.S. 533, 585
(1964).

*First*, the Court concluded that the "proximity to the general election puts this case squarely within Supreme Court precedent." But *Purcell* has **never** been interpreted as an exercise in counting down the days until election day. As an election draws nearer, the potential confusion *Purcell* seeks to forestall may become more pronounced. But whether a case is "within" *Purcell*'s cautionary zone (or outside of it) is a function of the potential impact on voters—not a function of the proximity of the election.

*Second*, District Court perceived a risk of error associated with a late addition to the ballot and potential for voter confusion. But this conclusion also flows from a mistaken interpretation of *Purcell.* To begin, while voter confusion is at the heart of *Purcell* and, thus, is a proper basis for withholding relief, this Court's decision in *Kim* makes clear that a threadbare allegation of "voter confusion" does not justify invoking *Purcell*. *See Kim*, 99 F.4th at 160 (finding *Purcell*-based argument unpersuasive where the alleged voter confusion was based on "nothing but speculation"). Rather, the risk of such confusion must be specifically shown by the party opposing relief on such grounds.

But the record here is utterly bereft of any evidence to support District Court's voter-confusion theory. Appellees did not present a shred of evidence to substantiate this theory. In fact, aside from a few glancing references to "confusion" when reciting *Purcell*'s holding, Appellees did not even argue the point.[8]

District Court, for its part, did not expound upon its reasoning regarding voter confusion. Indeed, it is unclear which voters would have been purportedly confused. Specifically, the "hundreds of thousands of voters" District Court referenced as having cast their ballots have, indeed, already cast their ballots. Ex. B at 2. Thus, there is no risk of confusion relative to those voters. And in any event, *Purcell* isn't aimed at eliminating "confusion" as such, but rather forestalling voter confusion that disincentivizes voting or results in disenfranchisement. Thus, those who had already voted may have become "confused" (in a colloquial sense) about why Candidates were originally denied ballot access. But having already voted, they could not have been

---

[8] Of course, voter confusion resulting from certain changes may be a matter of common sense (*e.g.*, moving polling locations, altering district lines, implementing new identification requirements, etc.); thus, in such cases, specific evidence may be unnecessary. But the "confusion" here is hardly self-evident.

disenfranchised. *See La Union del Pueblo Entero v. Abbott*, 705 F.Supp.3d 725, 767 (W.D. Tex. 2023) (holding that, under *Purcell*, "any voter's potential, subjective confusion is clearly outweighed by the irreparable harm that other voters will suffer absent injunctive relief").

As for the voters who have ***not*** yet voted, they similarly are unlikely to be confused, particularly if the Department is to take all reasonable steps to notify voters of Candidates' addition. As Marks acknowledged, that task could be accomplished with relative ease. Indeed, far from establishing voter confusion, Marks's testimony established the numerous ways the Department could alert voters of Candidates' addition, eliminating any true confusion in this regard. *See* Ex. A at 71-72.

In the end, the purported risk of voter confusion was "nothing but speculation[,]" *Kim*, 99 F.4th at 160 —and far-fetched speculation, at that. Absent specific evidence, District Court should not have so easily assumed that voters would be befuddled by an additional choice of candidate.

District Court also misinterpreted *Purcell* in holding that relief could be refused because of the potential errors that might result.

Specifically, just as boilerplate assertions of "voter confusion" are insufficient to justify recourse to *Purcell*, so too are highly speculative and generalized "concerns" about potential errors.[9] Yet, based on no real evidence of concrete risk of error, District Court relied on *Purcell* to deny relief.

The dearth of evidence is laid bare in District Court's rationale. For instance, District Court expressed concern that all or some of the counties may be unable to make the necessary changes in time. Yet Appellees presented no evidence—in any form whatsoever—from a single county. Not an affidavit. Not an email. Not even a triple-hearsay account from years past. Instead, the entirety of Appellees' factual presentation relied on Marks, whose hopelessly vague and largely speculative testimony revealed little. Marks didn't know how many counties had already started mailing ballots, couldn't say what counties had already started the process for printing election-day ballots, didn't know how many counties had conducted L&A, couldn't say how long

---

[9] *Goodall v. Williams*, 324 F.Supp.3d 1184, 1200 (D. Colo. 2018) (rejecting arguments of potential harm to the integrity of election administration and voter confidence because no specific evidence or explanation was offered).

redoing L&A would take (let alone how long it takes in the first instance). To the contrary, despite ready access to them, Marks acknowledged he hadn't spoken to *anyone*—in any county—about the potential difficulties associated with retesting/reprinting.

More to the point, Marks offered *no* evidence (empirical or anecdotal) suggesting that retesting/reprinting leads to an increased error rate. Critically, the only specific instance of ballot printing/configuration error Marks referenced (and District Court repeated) related to a statewide judicial retention race that had been certified months before the election. The miscues in Northampton County, therefore, were not precipitated by a change in the ballot makeup.

The potential issues associated with retesting, it appears, were also unfounded. On the same day the District Court hearing was held, a Stipulated Order was entered in a state court case pertaining to L&A in Montgomery County. *See Republican Nat'l Committee v. Montgomery Cnty. Bd. of Commr's*, No. 2024-22251 (C.P. Montgomery). The Montgomery County election board's stipulations confirm that, despite his lofty title, Marks's testimony isn't credible. Specifically, according to

the Stipulated Order, L&A commenced in Montgomery County on Monday September 23 at 8:00 a.m. and concluded by 11:30 a.m. *on the same day*. That L&A took less than four hours in *any* casts doubt on the veracity of Marks' error concerns. But the fact that Montgomery County is the third largest county in Pennsylvania *and* uses ballot marking devices at its polling locations—both of which were factors that Marks maintained would significantly increase the time necessary for L&A—utterly shatters any modicum of credibility he had remaining. Put simply, L&A can obviously be completed in less than four hours—without compromising the accuracy of the elections.

In sum, because there is nothing in the record to support District Court's finding of voter confusion and the evidence of potential error was minimal (not to mention incredible), District Court's second finding also doesn't support denial of relief based on *Purcell*.

District Court's third (and final) reason for applying *Purcell* was that "the Pennsylvania Supreme Court . . . has already deemed it too late to alter the election mechanics." Ex. B at 10. But both of the cases referenced by District Court involved changes to *election rules*—not candidate changes on the ballot. *See* Ex B at 10. In fact, in declining to

exercise jurisdiction, the state court expressly reasoned that it was unwilling to entertain "alterations to existing laws and procedures" at such a late juncture. *New Pa Project Educ. Fund v. Schmidt*, 112 MM 2024, 2024 WL 4410884, at \*1 (Pa. Oct. 5, 2024). And in any event, just yesterday, the State Supreme Court issued a 4-3 decision that changes the rules on how ballots will be canvassed in the upcoming election. *Genser v. Butler Cnty. Bd. of Elections*, 26 WAP 2024 (Pa. Oct. 23, 2024).

Moreover, to the extent deference to the Pennsylvania Supreme Court's "institutional" expertise in this realm is warranted, its decisions show that it has never hesitated to order late-breaking changes to candidate lineups, including ordering the addition of a candidate for U.S. Senate **one week** before the election. *In re Vodvarka*, 135 A.3d 1017 (Pa. 2016) (*per curaim* order).

So, with each of the three grounds for applying *Purcell* dispelled, it appears the only alleged burden relates to additional resources and work. But where constitutional rights are being violated, additional resources and work is a small price to pay to rectify that. Indeed, District Court acknowledged "that's how it ought to be—if someone's

constitutional rights are violated, the state and counties should figure it out."[10] Ex. B at 11; *accord Self Advocacy Sols. N.D. v. Jaeger*, 464 F.Supp.3d 1039, 1054 (D.N.D. 2020) ("[A]ny fiscal or administrative burden is miniscule when compared to the palpable threat of disenfranchisement."). In sum, District Court erred in its application of *Purcell* legally and its factual conclusions are unsupported by the record.

## B. Without injunctive relief, Appellants face irreparable harm.

The risk of irreparable harm absent an injunction is manifest and should require little discussion. As District Court recognized, it is well-settled that a violation of First Amendment rights constitutes irreparable injury. And so, too, in the context of an injunction pending appeal.

---

[10] To the extent administrative difficulties are relevant under *Purcell*, withholding relief in the face of a clear likelihood of a constitutional violation should not be countenanced absent a compelling showing that an injunction would pose a significant risk to the integrity of the election (*e.g.*, risk of error, inability to provide updated training for all local poll workers and employees, or substantial harm to voter confidence). *See Robinson v. Ardoin*, 37 F.4th 208, 231 (5th Cir. 2022) ("[T]he *Purcell* doctrine is about voter confusion and infeasibility, not administrative convenience.").

However, it is helpful at this juncture to briefly describe the relief Appellants seek and dispel any arguments regarding the legal viability of such a remedy. Specifically, Appellants seek a limited injunction pending appeal that directs Appellees to: (a) accept Candidates' Nomination Papers; (b) transmit an amended list of certified candidates to the county boards of elections; and (c) instruct counties to take all appropriate and reasonable measures to give full effect to Candidates' right to access the ballot, consistent with past practices and procedures involving late-coming changes to ballots ordered by courts.

Candidates stress that they do not seek to be included on absentee and mail-in ballots, given the limited time available. That absentee and mail-in voters will be deprived of their constitutional right to vote for Candidates is unfortunate. But because inclusion on all ballots is often impossible when names are added late, granting relief limited to election-day ballots is in no way unprecedented. *See Bryan*, 61 V.I. at 469-71 (collecting cases); *Wilson v. Hosemann*, 185 So.3d 370, 379–80 (Miss. 2016) (citing *United States v. Pennsylvania*, No. 1:cv-04-830, 2004 WL 2384999 (M.D. Pa. Oct. 20, 2004)). In short, courts recognize that some relief is better than no relief.

### C. The balance of harms weighs decisively in favor of granting an injunction pending appeal.

Without an injunction, Appellants' constitutional rights will be irreparably harmed. On the other side of the equation, the public interest always favors enfranchisement and any alleged harm to Appellees from an injunction pending appeal is either: (a) insufficiently significant to justify withholding relief; or (b) belied by the record and Marks himself.

First, public interest. At a time when "many face a crisis of confidence in our electoral system[,]" *In re Petitions to Open Ballot Box Pursuant to 25 P.S. §3261(A)*, 295 A.3d 325, 328 (Pa.Cmwlth. 2023), "[t]he public must have confidence that our Government honors and respects their votes." *Donald J. Trump for President, Inc. v. Secretary of Pa.*, 830 Fed. App'x 377, 390-91 (3d Cir. 2020). And because "[o]ther rights, even the most basic, are illusory if the right to vote is undermined[,]" this Court should not hesitate to act. *McInerney v. Wrightson*, 421 F.Supp. 726, 733 (D. Del. 1976) (internal citations omitted) (ordering candidate's name on the ballot, despite expressing reluctance about entanglement of federal judiciary in state election laws).

More fundamentally still, allowing Appellees to avoid all accountability for their unconstitutional conduct will have a significant deleterious impact on the public. For one thing, it sends a clear message to state election officials:  start out with some jargon that makes relatively simple tasks sound like nuclear physics (*e.g.*, L&A, or "functional testing"), use a few buzzwords, like "voter confusion" and "risk of error", round it all out with a citation to *Purcell*, and you are free to violate the United States Constitution.

The message to the public is also clear—and equally troubling: as long as there is an election on the horizon, the government can act with impunity where the right to ballot access is concerned. The result can only be disillusionment that further entrenches the dominance of the two-party system. As Dr. West aptly relayed during the hearing, "the two-party system does not allow the best of America, which [is] … the legacy of Martin Luther King and others." Ex. B at 9.

Put simply, the public interest "clearly favors the protection of constitutional rights, including the voting and associational rights of alternative political parties, their candidates, and their potential supporters." *Council of Alternative Political Parties v. Hooks*, 121 F.3d

876, 883 (3d Cir. 1997)); *Mitchell v. Donovan*, 290 F.Supp. 642, 646 (D. Minn. 1968) (finding "possible serious injury . . . to the plaintiffs if [their names] as Communist Party candidates for President and Vice-President do not appear on the printed ballot," but finding "no discernible probable injury which the defendants or the citizens of Minnesota will suffer" absent relief).

As for the interests of Appellees, it bears emphasizing that the bureaucratic difficulties or additional costs that may result from an injunction pending appeal are not a sufficient basis for denying relief. *See, e.g.*, *Robinson*, 37 F.4th at 231 ("[T]he *Purcell* doctrine is about voter confusion and infeasibility, not administrative convenience."); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (highlighting "the problem of sacrificing voter enfranchisement at the altar of bureaucratic (in)efficiency and (under-resourcing"). Indeed, it is the price that Appellees must pay for violating Appellants' most sacred and cherished constitutional rights.

As for the type of injury that would be a proper basis for denial of relief under *Purcell*, nothing in the record suggests that placing Candidates' names on the ballot would be "infeasib[le]" in the next

twelve days. *Id.* To the contrary, Marks testified that it *is* possible for the Department or counties to adjust ballots, even very close to an election, Ex. A at 64, and acknowledged that such changes occurred in 2014, with removal of a gubernatorial candidate 19 days before a primary election, and reinstatement of a U.S. Senate candidate on the ballot one week before the 2016 primary election. *See id.* And those counties that truly cannot implement the change in time can post notices.

In short, history proves that Appellees can and will adjust ballots on very short timelines when needed.[11] Ultimately, the very real irreparable harm to their constitutional rights that Appellants *will* experience outweighs the unsubstantiated harm Appellees *may* experience as a result of late changes to the ballots.

## III.  CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court grant an injunction pending appeal.

---

[11] And in any event, because Marks did not actually know where all 67 counties were in their ballot printing process, any alleged risk of harm from this late change will cause disruption is speculative at best.

Respectfully submitted,

Dated: October 24, 2024

/s/ Matthew H. Haverstick
Matthew H. Haverstick (No. 85072)
Shohin H. Vance (No. 323551)
Samantha G. Zimmer (No. 325650)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: mhaverstick@kleinbard.com
svance@kleinbard.com
szimmer@kleinbard.com

/s/ J. Andrew Crompton
J. Andrew Crompton (No. 69227)
Erik Roberts Anderson (203007)
Ryan T. Gonder (No. 321027)
Matthew L. Hoke (No. 331634)
McNEES WALLACE & NURICK LLC
100 Pine Street
Harrisburg, PA 17101
Ph: (717) 232-8000
Eml: dcrompton@mcneeslaw.com
eanderson@mcneeslaw.com
rgonder@mcneeslaw.com
mhoke@mcneeslaw.com

*Attorneys for Appellants*

## CERTIFICATIONS

I hereby certify that I am a member of the Bar of this Court.

I hereby certify that this Response complies with the Length Limit

in Fed.R.App.P. 27(d)(2)(A), in that in contains only 5,175 words,

exclusive of the cover page, table of contents, and signature block.

I hereby certify I served all parties by filing the foregoing

Response on the Court's CM/ECF filing system.

Dated: October 24, 2024      /s/ Matthew H. Haverstick
                     Matthew H. Haverstick (No. 85072)
                     KLEINBARD LLC
                     Three Logan Square
                     1717 Arch Street, 5th Floor
                     Philadelphia, PA 19103
                     Ph: (215) 568-2000
                     Fax: (215) 568-0140
                     Eml: mhaverstick@kleinbard.com
                     *Attorney for Appellants*

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


CORNEL WEST, et al.,

        Plaintiffs

  vs.                        Civil Action
                                No. 24-1349

PENNSYLVANIA DEPARTMENT OF
STATE, et al.,
              Defendants.

                   - - -


   Transcript of hybrid Zoom proceedings on October 7, 2024,
in the United States District Court, 700 Grant Street,
Pittsburgh, PA 15219, before Honorable J. Nicholas Ranjan,
United States District Judge.


APPEARANCES:

  For the Plaintiffs:    Matthew Hermann Haverstick, Esq.
                         J. Andrew Crompton, Esq.
                         Ryan T. Gonder, Esq.
                         Shohin Vance, Esq.
                         Samantha Zimmer, Esq.


  For the Defendants:    Jacob Boyer, Esq.
                         Stephen R. Kovatis, Esq.
                         Ian Everhart, Esq.

  Court Reporter:        Veronica R. Trettel, RMR, CRR
                         U.S. Courthouse
                         700 Grant Street
                         Suite 5300
                         Pittsburgh, Pennsylvania 15219




   Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

I N D E X

WITNESSES:                                              PAGE

CORNEL WEST

 Direct by Mr. Haverstick.....................      5

 Cross by Mr. Kovatis.........................     18


JONATHAN MARKS

 Direct by Mr. Boyer..........................     31

 Cross by Mr. Haverstick......................     63

 Redirect by Mr. Boyer........................     74

 Recross by Mr. Haverstick....................     80

1               P-R-O-C-E-E-D-I-N-G-S

2            Monday Morning, October 7, 2024

3                  (In Open Court)

4          THE COURT:  Good morning, everyone.  You may be

5     seated.  We here today in the case of Cornel West, et al.

6     versus Pennsylvania Department of State, et al., at case

7     24-1349 for a hearing on plaintiff's motion for a TRO and

8     preliminary injunction.

9          Why don't we start by having counsel enter their

10    appearance beginning with plaintiff.

11         MR. HAVERSTICK:  Your Honor, for the plaintiffs, Matt

12    Haverstick, Shohin Vance, Samantha Zimmer on behalf of

13    plaintiffs, and Mr. Andrew -- J. Andrew Crompton on behalf

14    plaintiffs as well.

15         THE COURT:  All right.  Great.  Good morning.

16         For the defendants.

17         MR. BOYER:  Good morning, Your Honor.  Jacob Boyer

18    on behalf of the defendants.  With me at counsel table is

19    Stephen Kovatis and Ian Everhart, who has not entered his

20    appearance in this matter, but is an attorney for the

21    Department of State.

22         THE COURT:  Great.  Welcome, everyone.  So you

23    received my order.  I had allocated two hours per side to use

24    however you like, whether it's through witness presentation

25    and argument.  I also received a binder of some exhibits and

1   then a joint stipulation of facts from the parties.

2        I know we have some individuals online or rather

3   remotely observing, and my understanding is there may be

4   witnesses also testifying remotely.  Is that right?

5        MR. HAVERSTICK:  Yes, Your Honor.  By the way, I

6   should add Ryan Gonder along as counsel of record.

7        THE COURT:  Okay.

8        MR. HAVERSTICK:  I think the plan is -- I'm going to

9   speak to these guys, we talked about it.  We each have a

10  witness to call.  It will be done remotely.  We have an

11  affidavit to submit which counsel is reviewing presently and

12  then we have a set of stipulations.  So we may be able to

13  truncate the evidentiary proceedings today.

14       THE COURT:  Okay.  Great.  Thank you.

15       Mr. Boyer, anything to add on that?

16       MR. BOYER:  No, Your Honor.  That's consistent with

17  our understanding.

18       THE COURT:  All right.  Very good.  Then I'll hear

19  from the plaintiffs.  Mr. Haverstick, do you want to proceed?

20       MR. HAVERSTICK:  Yes, thank you, Your Honor.  And I

21  will call Dr. Cornel West as our first witness.

22       THE COURT:  All right.  Very good.

23       Dr. West, can you hear us?

24       DR. WEST:  Yes, indeed.  Yes, indeed.  Thank you so

25  very much.  Can you hear me all right?

1          THE COURT:  Yes, we can.  And I would advise if at

2    any point in time you cannot hear me or any of the lawyers,

3    feel free to jump in and let us know.  We'll make sure the

4    connection is working all right.

5          DR. WEST:  Thank you very much, Your Honor.

6          THE COURT:  We'll start by having my courtroom deputy

7    administer the oath to you, Dr. West.

8          THE DEPUTY CLERK:  Hi, Dr. West.  Can you please

9    raise your right hand.

10         CORNEL WEST, a witness herein, having been first duly

11   sworn, was examined and testified as follows:

12         THE COURT:  All right.  Thank you.

13         Mr. Haverstick, you may proceed.

14         MR. HAVERSTICK:  Thank you, Your Honor.

15   (Dr. West testified via Zoom)

16                        DIRECT EXAMINATION

17   BY MR. HAVERSTICK:

18   Q.  Good morning, Dr. West.

19   A.  How are you doing?  Good to see you.  Well, I can't see

20   you, but it's good to hear your voice.

21   Q.  Well, I can see you and it's good to talk to you again and

22   thank you for participating today in this hearing.

23         Dr. West, you're an active admission and theologian.  Tell

24   the Court and counsel about your background and what you do.

25   A.  Well, I am my mother's child -- (Zoom audio is distorted.)

1          THE COURT:  I'm sorry?

2    A.  Can you hear me all right?

3    Q.  Yep.

4          THE COURT:  Can you repeat that?

5    A.  Oh, I just said I'm an advantaged child.  I'm my mama's

6    kid, Irene West and Clifton West.  I'm a child that grew up in

7    the Baptist church -- (Zoom audio is distorted).

8          THE COURT REPORTER:  I'm sorry, I am having trouble

9    hearing.

10   A.  -- a member of the Black Panther Party, because remember

11   I'm a Jesus-loving free black man and blessed to be educated

12   at Harvard College and Princeton University, and I always

13   viewed myself trying to be a fallible force for good in a

14   society that I understand to be both broken but also full of

15   promise, and I decided 54 years ago to try to keep alive the

16   legacy of the great Martin Luther King, Jr., Fannie Lou Hamer,

17   Ella Baker and Rabbi Heschel and Dorothy Day, Edward Said,

18   simply trying to tell the truth and bear witness to justice,

19   and I believe that the condition of truth is to allow

20   suffering to speak and I believe that justice is what love

21   looks like in public.  So I have a particular kind of calling,

22   particular kind of vocation to try to be true to it, my

23   Brother Matt.

24   Q.  Dr. West, don't be modest, you have been a professor and

25   had academic postings at some really serious universities and

1   seminaries; right?

2   A.  I've been blessed to teach at Union Seminary and Yale and

3   Harvard University and Princeton, and I'm back now at Union

4   Theological Seminary.  I've lived an excessively blessed life

5   in terms of professional achievement.  But the most important

6   thing is trying to hold onto the integrity, honesty and

7   decency in the short amount of time I had between my mother's

8   womb and the tomb, my brother.

9   Q.  And let's not forget you are a movie star.

10  A.  No, I wouldn't go that far.  We don't want to start lying

11  now.  I made some appearances in the Matrix and other places,

12  but I'm far from a movie star.

13  Q.  Counselor West, and I know that this is not a fact of

14  record today, but I will aver that I think Matrix Reloaded was

15  the best of the three movies and you had a very good role in

16  that.

17  A.  Well, that is your fallible opinion, but I appreciate you,

18  but they are certainly opinions, they are artistic opinions,

19  no doubt about it.

20  Q.  Now, you were also participating in the political process,

21  and tell the Court about what you are doing and why.

22  A.  Well, as I said before, I have been running for justice

23  for 54 years, and I'm a christian.  That's means I'm running

24  for Jesus, too, and just a matter of trying to make sure that

25  the least of these, the poor people and working people of

1    whoever color, and whatever side of town, and the love spills

2    over, that they are treated fairly and they have equal assets,

3    not just equal protection under the law, but are treated

4    fairly and, most importantly, that their dignity is affirmed.

5       So I've always found myself in but not of the world, in

6    but not of the system, and even in but not of the Academy

7    because you are always cutting against the grain, and every

8    institution is shot through with its own forms of organized

9    breed and weaponized contempt, and therefore, you have to try

10   to somehow be a levain in that loaf, and I've always tried in

11   my own fallible way to be a levain in the loaf of any system

12   without that system somehow forcing me to become well-adjusted

13   to the injustice and well-adapted to the indifference.  That's

14   what it is to have christian witness or a particular kind of

15   prophetic witness that I've always viewed myself as being a

16   part of.

17   Q.  You formed this year the Justice For All party.  What is

18   that?

19   A.  Justice For All was simply an attempt to be fundamentally

20   what is the truth and justice and love, which is a way of

21   trying to keep alive the legacy of Martin Luther King and

22   others.  Of course, Martin believed that American democracy

23   was being devoured by militarism and racism and poverty and

24   materialism on the spiritual front, and it's -- the party

25   itself is really just rooted in Martin Luther King, Jr.'s

1    message and his life and his witness but in a 21st century

2    context.

3    Q.  You were the presidential candidate for the Justice For

4    All party for 2024?

5    A.  That's exactly right.  Exactly right.

6    Q.  Why are you running for that office?

7    A.  Well, I'm just thoroughly convinced that we are living in

8    society and there's just so much spiritual decay and moral

9    decadence, and when it comes to this indifference towards the

10   vulnerable, when it comes to dealing with the levels of

11   corruption in the system and the civic rot -- and by civic

12   rot, what I mean is our public life becomes so poisoned, our

13   public life has become so very contaminated with contempt and

14   disrespect and put down, and so forth, that I didn't see

15   anybody running at the presidential level who would raise

16   these kinds of questions.  I'm thoroughly convinced that the

17   two-party system does not allow the best of America, which I

18   understand to be the legacy of Martin Luther King and others,

19   the best of America become visible.  So it looks as if more

20   and more we're addicted to a kind of self-destruction and

21   headed towards Civil War II, not just militarily, but

22   civically, spiritually, morally.

23       And so I thought that my candidacy could be won if, in

24   fact, it had a certain kind of ability, a certain kind of

25   potency that could keep alive what I understood to be the best

 1    of the country, and that has everything to do with the black

 2    freedom movement.  It has everything to do with those love

 3    waves that come out of a black people who have been so hated

 4    and the freedom fighters of the black people been so

 5    terrorized and the wounded healers of a black people who have

 6    been so traumatized, and joy spreading from the black people

 7    who have been so shot through with sorrow, and it has

 8    everything to do with Martin King and Fannie Lou Hamer, termed

 9    the love warriors.  It has everything with the Frederick

10    Douglass or Harriet Tubman termed the freedom fighters.  It

11    has everything to do with Aretha Franklin and, of course, I'm

12    in Pittsburgh, so I should mention Billy Strayhorn.  I should

13    mention Earl -- (Zoom audio is distorted).  But when it comes

14    to joy spreaders, it comes out of our churches, it comes out

15    of our clubs, it comes out of our barber shops and beauty

16    salons, and it spills over.  It's deeply humanistic, but it is

17    shaped by what it means to be enslaved.  And I should say

18    this, though, there's no doubt that Pennsylvania has been

19    ground zero for the 14th Amendment.  That's why this

20    particular hearing is so crucial because the John Harmer

21    beings of the world, the great people, the great vast

22    esteemers, these are folks who come out of Pittsburgh.  Titus

23    Basfield, the first black graduate of Presbyterian Seminary in

24    all of America graduated from Pittsburgh Theological Seminary

25    or Bishop Matthew Simpson who gave the eulogy for Lincoln when

1    he died in Springfield, deeply shaped by Pennsylvania culture.

2    There is something about Pennsylvania in regard to this 14th

3    Amendment that I think the world already knows, but it's very

4    important in terms of this hearing because equal protection,

5    probably the most litigated section of the constitution is

6    very important, and we know it began coming to terms with the

7    plight and predicament of black people, but the best of the

8    black freedom strugglers has always been universal.  It's

9    always been humanistic.  It embraces oppressed, all suffering

10   people, and in the end, all human beings tied to their dignity

11   and sanctity that I believe is endowed to them by God, but

12   that's just my own christian take on these things.  People

13   have different interpretations, secular leaders on Buddhism

14   and Judea thinkers and other traditions, but most importantly,

15   for me, I'm fundamentally committed to the best of that moment

16   in the constitution when we're talking about equal protection

17   under the law on every level.

18   Q.  Now, you mentioned Pennsylvania.  I want to talk about

19   Pennsylvania because that's why we are here.  How has your

20   message been received among Pennsylvania voters when you have

21   been out talking to them?

22   A.  Oh --

23         MR. KOVATIS:  Objection to relevance, Your Honor.

24   A.  It's been wonderful --

25         THE COURT:  One second, Dr. West, sorry.

1    BY MR. HAVERSTICK:

2    Q.  Dr. West, hold on.  There's been an objection.  Counsel

3    wants to raise an objection.

4    A.  I'm sorry.

5            MR. KOVATIS:  Objection to relevance, Your Honor.

6            THE COURT:  Okay.  Mr. Haverstick.

7            MR. HAVERSTICK:  Your Honor, I think it's important

8    for the Court to know as it evaluates the public interest what

9    the public actually thinks based on what Dr. West has seen and

10   observed about his ideas and his candidacy.

11           MR. KOVATIS:  Your Honor, the public interest is not

12   the merits of anybody's candidacy.  The issue here is the

13   public interest related to the process for getting onto the

14   ballot.  That's the topic for the hearing and the discussion

15   today, and the purpose and message -- and I appreciate

16   background is certainly appropriate here, but the depth on the

17   background and the candidate's opinion of how his message has

18   been received by the people of Pennsylvania is irrelevant to

19   whether he should be on the ballot.

20           THE COURT:  I'll note the objection.  Overrule it.  I

21   do think, though, we are at the point maybe after this

22   response to maybe segue.

23           MR. HAVERSTICK:  All right.

24   BY MR. HAVERSTICK:

25   Q.  Dr. West, here's how I'm going to do this.  I would like

1    to know, in short order, how your message was received by

2    folks in Pennsylvania, but then, if you could, tell the Court

3    about the difficulty you've had in general terms getting on

4    the ballot in Pennsylvania.

5    A.   Well, I've always been blessed to have a wonderful

6    relationship with the citizens of Pennsylvania.  There's no

7    doubt about it.  Philadelphia, in many ways, the city, the

8    great John Coltrane, and his love is supreme is inseparable

9    from what I'm all about, inseparable from Martin Luther King,

10   Jr., ethic of love, and in so many different instances, I have

11   been both listening and learning from the citizens of

12   Pennsylvania, but I have also been able to present my case,

13   and all I wanted to do is just to make sure I can present a

14   fair and strong case, and I'm concerned with each and every

15   candidate to be able to do that.  I want my dear Sister Kamala

16   Harris to be able to present her case so people can critically

17   reflect and respond.  I want Bother Trump to present his case

18   and let the people respond.  Let Sister Claudia De La Cruz

19   present her case.  Let Brother Randall (Zoom audio is

20   distorted) Brother Chase.  We just want Socratic energy, a

21   robust and vital public life, and I come from a people whose

22   anthem is lift every voice, not lift every echo, and when you

23   lift the voices, present the voices, and then let the people

24   decide.  I don't believe in spoon-feeding people.  I think

25   people can think for themselves.  I don't demonize people who

1    disagree with me.  I don't demonize people who choose other

2    candidates, but I just want to make sure there's equal

3    protection under the law and make sure that the voices are

4    heard.  Why is that so?  Because in the end when you lose the

5    integrity of a process, in the end when you generate distrust

6    in public life, it re-enforces the spiritual decay, it

7    re-enforces moral decadence that we are already being plagued

8    in terms of the organized greed and the weaponized hatred,

9    and, in fact, the movements and marches these days to attract

10   a sense of stability, and it's a very, very sad thing to see,

11   and that's why I refuse to simply be a spectator.  I

12   intervene.  I participate.  I try to raise my voice to keep

13   alive the best that has been poured into me by Irene and

14   Clifton and Shiloh Baptist Church, and all of that has gone

15   into the shaping of this crafted vessel named Cornel West.

16   Q.  Has it been hard for you to raise your voice and

17   participate in Pennsylvania as a candidate?

18   A.  Well, I have been able to do it in terms of conversation,

19   but in terms of institutional capacity, in terms of trying to

20   gain access to ballot, it's been very, very difficult.  I

21   think there's been a disadvantage in that.  But it's not just

22   me.  This is in no way about me.  This is about equal

23   potential of voices.  I think this is true for independent

24   candidates across the board.  This is true for third-party

25   candidates across the board because you have a situation where

1    the two-party system has a strangle hold -- we know it's got

2    big money, it's tied to corporate donors, very much tied to a

3    certain kind of greed -- I'm sorry to use that strong term,

4    but I can't help but use it because that's what I see.  So

5    it's very difficult for the citizenry to gain access to a

6    variety of different voices, and I see that two-party system

7    as an impediment in so many ways if we are going to keep alive

8    what the country has been able to produce.

9    Q.  Dr. West, one more question for you and let me set it up.

10   You're probably not going to win this presidential election.

11   You are probably not going to get on every ballot in

12   Pennsylvania.  Why bother?

13   A.  You know, the great Rabbi Abraham Joshua Heschel used to

14   say if you view life as a gold rush, you end up worshiping the

15   golden calf and you transform the golden rule of do unto

16   others that you would have other do unto you, and to simply

17   those who have the gold rule.  That is the triumph of

18   (indiscernible) Socrates in a republic, that might make right

19   integrity, honesty, and decency.  That's the triumph of

20   Pontius Pilate over Jesus.  What is truth?  Wash my hands.

21   Take Him and do what you will.

22       Well, winning for me is not simply about elections.  It is

23   about bearing witness to the greatness of a people.  I come

24   from a great black people, and when you win, you keep alive

25   the moral and spiritual greatness of the people who have

1    allowed you to sustain your sense of dignity, and so I'm

2    trying to witness in that way, and you can imagine, you know,

3    I got all kinds of people, not just critics, people who will

4    trash me and say it's about vanity, it's about hubris, it's

5    about so-and-so.  People are right to be wrong.  I fight for

6    people's right to be wrong.  I've got libertarian

7    sensibilities, but I know I also have a certain kind of deep

8    commitment to the truth-telling and justice-seeking, and that

9    means then that I've got to be true to my momma, my daddy, my

10   tradition.  I have to be true to the young people, they can

11   see that there are some people who are not willing to just

12   cave in and give up and sell out, and that's a very important

13   reason why talk about Bingham, the reason why we talk about

14   Basfield, the reason why we talk about Stevens, the reason why

15   we talk about Bishop Simpson is that they didn't sell out.

16   They were abolitionists.  There were just a few thousand

17   abolitionists in a fairly white supremacist society of levels

18   of bombarity for black people.  But it's a question of

19   morality.  It's not a question of skin pigmentation.  It's a

20   question of spirituality.  It's not a matter of what color

21   your skin or gender or class.  That's what it is to be a

22   christian.  That's what it is to be a freedom fighter.  That's

23   what it is to be a love warrior in my humble opinion, and

24   that's why running for justice -- in this case, running for

25   president -- it's the same thing I have been doing for 54

1    years in the classroom, (indiscernible) president for 51

2    years.  I've seen the situation of those en masse

3    incarcerated.  I don't see either party speaking to that,

4    either party speaking to deep poverty, either party can't say

5    about genocide in Gaza, the whole host of issue, they can't

6    say a word about it.  That is morally and spiritually bankrupt

7    for me, and it might not make any sense in the eyes of the

8    world, it makes all the sense in the eyes of what is going

9    through the shaping and molding of who I am, and I don't say

10   this in any spirit of self-righteous.  I could be wrong.  I

11   listen.  I can be wrong.  And as I said before, people can

12   disagree with me and vote for other candidates.  That's fine.

13   Think for yourself, but I want to be able to make my case

14   based on equal protection under a law such that is available

15   and such I'll not have every disadvantage, as we underwent, as

16   you can imagine, you know, I'm trying to get on the ballot

17   with the electors, trying to first gain access to the rules

18   and having difficulty and then finally being able to do that

19   and say that we had to undergo a whole host of procedures that

20   the two, the major two parties did not have to undergo, and

21   when you have both parties together making the rules and

22   enforcing the rules, then it marginalizes the independent

23   candidates.

24   Q.  Dr. West, thank you for being here this morning.  I

25   appreciate it.  I think the Court appreciates it and it was

1     meaningful.

2              MR. HAVERSTICK:  Thank you, Your Honor.  No further

3     questions for this witness.

4              THE COURT:  All right.  Thank you.

5              For the defense, Mr. Kovatis, any questions?

6              MR. KOVATIS:  Yes, Your Honor.

7                        CROSS-EXAMINATION

8     BY MR. KOVATIS:

9     Q.  Good morning, Dr. West.  My name is Stephen Kovatis.  I am

10    an attorney with -- for the Pennsylvania Department of State

11    in this case.  I just have a few questions for you.

12         Again, I just want to echo Mr. Haverstick and thank you

13    for coming in and spending your time with us today.

14    A.  I thank you, my dear brother, indeed.

15    Q.  You announced your candidacy for president in June of

16    2023.  Do I have that right?

17    A.  That's right, June 5th, absolutely.

18    Q.  And you formed the Justice For All party earlier this year

19    around January of 2024?

20    A.  That's right.

21    Q.  You testified earlier about delivering a message.

22         Would you agree with me that you are currently free to

23    deliver the message, as you will, in and out of Pennsylvania?

24    A.  In the public square, in churches and mosques and

25    synagogues, nightclubs, you are absolutely right, but I can

1  raise my voice and that's a beautiful thing as far as

2  libertarian commitment to make sure we can raise our voice.

3  Now, the translation of that is in the institutional capacity

4  to get on the ballot is another issue, but absolutely right, I

5  am free to raise my voice.

6  Q.  It is another issue.  In fact, you have never been shy

7  about bearing witness, to use your words; isn't that right?

8  A.  I try not to be shy, but I'm shy through fallibility and

9  imperfection though, brother is all, you know.

10  Q.  So as you just mentioned, the goal, one of your goals from

11  the outset was to get on state ballots; isn't that right?

12  A.  That's exactly right.

13  Q.  And that goal was important to you?

14  A.  Well, just not to me, but it's important to the campaign,

15  which is a moment in the movement of the great people, yes,

16  that's right.

17  Q.  And at the time that you announced your candidacy and

18  formed the Justice For All party, you understood that

19  different states have different ballot access rules; correct?

20  A.  That's right, absolutely.

21  Q.  Did you know Pennsylvania's ballot access rules yourself

22  at the time?

23  A.  No, no, no, I don't.  I got a magnificent team and I've

24  got some volunteers that I don't have a language for, but my

25  God, when I think of Sister Gianna (phonetic), my visionary

1    courageous campaign manager, and Mike McKorkle who is just

2    beyond description in the legal mind and unbelievable

3    commitment, and Brother Alex Cordinatto, (phonetic) -- I could

4    go on and on -- Brother Edwin DeJesus, we have a heck of a

5    team, but you can imagine, it's a very small team.  We raised

6    $1.2 million the whole campaign.  You got brothers and sisters

7    in the democratic party that raised 540 in one month.  So this

8    is a real David versus Goliath small (indiscernible)

9    situation, but that's all right.  We still bear witness.

10   Q.  And I understand that, Dr. West, but I want to focus

11   specifically on the campaign's efforts to obtain counsel

12   related to ballot access.

13       Did you try to obtain counsel in order to get on ballots

14   when you announced you were a candidate for presidency in June

15   of 2023?

16   A.  Well, I had access to magnificent lawyers, Brother Mike

17   and Brother Aaron, but those two particular lawyers who worked

18   25 hours a day and, for the most part, without pay are unable

19   to come to terms with 50 states simultaneously.

20   Q.  So you have --

21   A.  So that --

22   Q.  Dr. West, you had counsel in 2023 for the purpose of

23   obtaining ballot access; correct?

24   A.  Well, no, I wouldn't go that far either.  I would say that

25   I have had two magnificent lawyers who have attempted to at

1    unbelievable levels of commitment, attempted to push through

2    processes that allow us to have legal counsel, but oftentimes

3    the legal counsel that we end up having come from the outside.

4    It has no connection, no correlation, no coagulation

5    whatsoever.  They are citizens who decide to simply raise

6    their voices and to be part of a process but unrelated to us.

7    Q.  Dr. West, I'm asking specifically about lawyers

8    representing your campaign, not other lawyers who happen to

9    speak out.  Do you understand that distinction?

10   A.  Yeah, I got those two lawyers, yes.

11   Q.  So you --

12   A.  The two lawyers.

13   Q.  And you've had those lawyers for many months; correct?

14   A.  Oh, absolutely.

15   Q.  Okay.

16   A.  Absolutely.

17   Q.  On July --

18   A.  They have been superb.  They have been superb.

19   Q.  On July 11th of this year, Dr. West, your campaign

20   submitted nomination paperwork to the Pennsylvania Department

21   of State; correct?

22   A.  Well, I don't know the exact date, but it sounds right.

23   Q.  Do you have any reason to dispute that it occurred on or

24   around July 11th of this year?

25   A.  No, I don't have any reason to dispute it.

1    Q.   And those nomination papers were rejected by the

2    Department of State; correct?

3    A.   That's right.

4    Q.   And at the time you were represented by those two able-

5    bodied lawyers you mentioned early; correct?

6    A.   That's right.  Or at least to my knowledge, let me put it

7    that way, yeah.

8    Q.   And would you agree -- well, so during that time,

9    Dr. West, as of July, your campaign understood that the

10   Department of State was not accepting your nomination

11   paperwork because you did not have affidavits from all 19

12   electors; is that correct?

13          MR. HAVERSTICK:  Objection.  I think it misstates --

14   well, first of all, I don't think he has laid a foundation for

15   when the rejection actually happened.  Did it happen in July

16   or did it happen later?

17          THE COURT:  I'll overrule that.  Dr. West, you can

18   answer if you know.  Maybe can you re-ask the question.

19   A.   Could you repeat that question?  I'll listen just a little

20   closer.

21   Q.   Certainly.  On July 11th, Dr. West, you understood that

22   your campaign's nomination paperwork had been rejected;

23   correct?

24   A.   Yes, yes, yes, yes.

25   Q.   And you understood that it had been rejected because you

1   did not have candidate affidavits for the 19 electors;

2   correct?

3   A.   Well, in the context in which there was an unfair and

4   unequal treatment of the overwhelming disadvantage of what we

5   had to undergo and what the two major parties had to undergo,

6   but in light of that context and that backdrop, yeah, that's

7   true, that's what the reasons for it, as I understood.

8   Q.   I'm not asking if you agreed with the reason, Dr. West.

9   I'm asking if you understood that that was the reason?

10  A.   It's hard for me to separate those two, but, yes, okay.

11  Q.   And your campaign then endeavored in the following weeks

12  in order to correct that error; correct?

13  A.   To make sure we were being treated equally and fairly and

14  to make sure that the citizens of Pennsylvania had access to

15  our vision, our stories, our analysis and our witness, yes,

16  mm-hmm.

17  Q.   So at that point, did you believe your campaign was being

18  treated unfairly?

19  A.   Oh, absolutely.  You got electors that have to undergo the

20  processes that they do, vis-a-vis the two major parties, it's

21  clear, I mean for me it's clear it's an unequal and unfair

22  access to the ballots, very much so.

23  Q.   But then --

24  A.   But --

25  Q.   -- Dr. West, in those weaning weeks of July, you did not

1    file a lawsuit; isn't that correct?

2    A.   I don't recall.  I don't recall.  I don't think we did.  I

3    don't think we did.

4    Q.   After --

5    A.   I had Brother Mike about --

6    Q.   Dr. West, you're not aware of, certainly aware of any

7    lawsuit that your campaign filed related to ballot access in

8    late July of 2024; fair to say?

9    A.   Yeah, I don't recall that.  I don't have a date line in my

10   mind.  So I apologize for this, my brother.  I don't have a

11   date line in my mind.  But I know that we were oscillating, we

12   were swaying back and forth.  We were on the ballot.  We were

13   off the ballot.  We were on the ballot.  And I don't have a

14   date line of each one of those moves, not at all.

15   Q.   But at that point, you felt that you were being treated

16   unfairly; right?

17   A.   Oh, oh, absolutely.  But it's just not Pennsylvania we're

18   talking about.  As you know, we had struggles in Georgia.  We

19   had struggles in North Carolina.  North Carolina we were back

20   and forth.  Right now in Georgia we are on the ballot, but the

21   votes don't count.  So every voting booth has a little sign

22   "Vote For West.  It won't count, but his name is on the

23   ballot."  That's what it's been across the board just trying

24   to make sure that we have some kind of fairly equal treatment.

25   Q.   I can appreciate that, Dr. West.  Here I would like to

1   focus just on Pennsylvania.

2   A.  I understand that, I understand that, and rightly so.

3   Pennsylvania deserves the specificity --

4   Q.  We can both agree on that for sure.

5   A.  Oh, yes, there's something special about Pennsylvania, you

6   know what I mean?  No doubt.

7   Q.  Are you aware that on August 15th, three of your electors

8   filed suit in Pennsylvania state court?

9   A.  Three of my electors filed suit in Pennsylvania state

10  court?  That doesn't ring a bell.  Tell me more about that.

11  Q.  You're not aware that there was a lawsuit filed in

12  Pennsylvania state court by your electors seeking the exact

13  same relief that you are seeking in this lawsuit?

14  A.  Oh, oh, yeah.  I thought you were saying against me.

15  Q.  No.

16  A.  I got so many filed against me, it's hard to keep track,

17  but the three filing suit for the same claim that I'm making,

18  that this is unfair and unequal, yes, oh, absolutely.  I

19  thought you said against me.  I said, Oh, my God I've got to

20  check, I got another one.

21  Q.  Would you agree with me that those electors were

22  represented by able-bodied counsel?

23  A.  Well, I don't know.  I didn't keep close track.  I didn't

24  keep close track at all.

25  Q.  Dr. West --

1    A.  I don't know.  I pray that they were, but I just don't

2    know.

3           MR. HAVERSTICK:  Your Honor, I'll stipulate that he

4    was represented by able-bodied counsel.

5           THE COURT:  Okay.  So noted.

6    BY MR. KOVATIS:

7    Q.  They are, Dr. West, the same counsel that represent you

8    here today?

9    A.  Oh, Brother Matt would know.  Absolutely.  And Brother

10   Paul, too.  Paul is very, a special brother.  We won't get

11   into his specials.

12   Q.  Would you agree with me then that when that lawsuit was

13   filed by your electors in Pennsylvania state court, that your

14   interests were being ably represented?

15   A.  By legal counsel?

16   Q.  In that lawsuit, that your interests in getting on the

17   ballot were being equally represented.  Would you agree with

18   that?

19   A.  Yeah, I think I would agree.  See, I didn't have any close

20   relation to it and I didn't have any, you know, communication

21   with it, but, yes, I would agree.  I have confidence in my

22   legal counsel those who are willing to step forward.

23   Q.  And at that point, you also obtained, or shortly

24   thereafter after August 15th, I believe in another case that

25   was represented, it was August 22nd, the campaign retained

1    counsel for the purpose of litigating your access to the

2    ballot; is that correct?

3    A.   That sounds right.  It sounds right, yeah.

4    Q.   And do you recall on August 28th of this year, your

5    campaign filing in state court a document seeking to

6    personally what we lawyers call intervene in that lawsuit?

7    A.   What does that mean in non-legalees, though, brother?

8    Q.   To join the lawsuit.

9    A.   Oh, to join the lawsuit.

10   Q.   Do you recall being part of that?

11   A.   That sounds right, too, yeah, mm-hmm.

12   Q.   And at that point -- and this is the same counsel you have

13   here today; correct?

14   A.   I think so.  I think so, yeah.  You would have to ask

15   Brother Matt about all of these date lines.

16   Q.   I can't.  I have to ask you, Dr. West.

17   A.   I'm not one to answer all of the details because I

18   really -- I don't have a mastery of the facts and the

19   particular details of the shifts that's been taking place

20   because I have been doing three events a day in 48 states, so

21   brother, so that -- especially Pennsylvania.  It's not that I

22   wake up in the morning thinking about Pennsylvania.  You know

23   what I mean?  I've got other states I've got to come to terms

24   with, but it sounds right, but you would have to check with

25   Matt in terms of truth.  I'm very concerned about the truth

1    here and the evidence being confirmed and validated.

2    Q.  So at that point, on or about August 22nd, you had both

3    counsel for the campaign that we agreed you've had for many,

4    many months at that point and you also specifically had

5    litigation counsel for the purpose of determining what your

6    best course of action was to get your name on the ballot.  Can

7    we agree on that?

8    A.  Sounds right, brother, yes, mm-hmm.

9    Q.  And are you aware that in that Pennsylvania lawsuit, the

10   Pennsylvania Supreme Court ended up denying relief, denying

11   your ballot access on September 16th?

12   A.  Absolutely.

13   Q.  And you did not file a lawsuit on September 16th; correct?

14   A.  Not that I recall, but I do recall the Supreme Court

15   putting forward in some declaration and statement, yes.

16   Q.  In fact, you waited 12 more days until September 25th to

17   file this lawsuit that we're here on today; correct?

18   A.  Sounds right, my brother.

19   Q.  And now this lawsuit has been pending for 12 days where

20   we've had pleadings, briefing and now this full hearing; sound

21   right?

22   A.  Sounds right, my brother, absolutely.

23   Q.  But we are here today more than 12 weeks after, you agree

24   after, as we discussed earlier, your campaign, you personally

25   felt grieved by the lack of access in July of 2024; isn't that

1    right?

2    A.  Oh, absolutely.  I mean, when you are just feeling some of

3    the effects of the unfair and unequal treatment based on being

4    a third-party candidate, yes, absolutely.

5            MR. KOVATIS:  No further questions, Your Honor.

6            THE COURT:  Thank you.

7            Mr. Haverstick, any redirect?

8            MR. HAVERSTICK:  No, Your Honor.

9            THE COURT:  All right.  Thank you.

10           Dr. West, thank you for your testimony.  You are

11   excused.  You can remain on the line and observe or hang up.

12   I appreciate it.

13           DR. WEST:  I deeply appreciate you all giving me the

14   chance and, Your Honor, I salute you and the work that you do

15   and the staff that you have.  I just hope and pray that your

16   loved ones and your family are doing all right.

17           THE COURT:  All right.  Appreciate it.  I have to say

18   that I always love hearing reference to Billy Strayhorn, who

19   is a great Pittsburgher.  So I know you noted him during your

20   testimony.  Actually, I have a portrait of Billy Strayhorn,

21   Duke Ellington, and The Dancer that's sort of an iconic

22   Pittsburgh portrait.  So all of those Pittsburghers, I always

23   appreciate the shout-out to them.  So thank you.

24           DR. WEST:  Thank you.  I'm right here in Harlem on

25   123rd Street for that A train going right across the way as it

1    were.  Duke and Billy Strayhorn, just gave a gift to the

2    world.

3              THE COURT:  Yep.

4              DR. WEST:  So much joy and so much richness and

5    handsome, as far as you can imagine.  But thank you all.

6    Thank you, Brother Matt and Brother Mike.  God bless you all.

7    Take good care.

8              THE COURT:  All right.  Thank you.

9              Mr. Haverstick, is that your only witness?

10             MR. HAVERSTICK:  It is, Your Honor, and I think

11   considering the burden shifting that goes on for the four-part

12   test, I assume that the department is going to call Mr. Marks

13   and we'll cross him.  I suppose I can call him adversely, but

14   it makes more sense for you guys to call him.

15             THE COURT:  I'm fine with that.  If we want to

16   proceed with the defense calling him in the first instance and

17   I'll allow some leeway on cross here.

18             MR. HAVERSTICK:  Okay.

19             MR. BOYER:  Happy to discuss it, but I do disagree

20   with the burden of our presentation Mr. Haverstick just made.

21             THE COURT:  Okay.  We can get to that.  My thought

22   would be we begin this witness' testimony, and then the

23   lawyers can argue what you want to argue at that point.

24             MR. BOYER:  Thank you, Your Honor.

25             THE COURT:  Okay.  Why don't we have my courtroom

1    deputy here administer the oath to Secretary Marks.

2          And Secretary, can you hear us okay?  I just want to

3    make sure that the audio is working on your end.

4          SECRETARY MARKS:  I can most of the time.  Your voice

5    periodically is a little muffled, Your Honor.

6          THE COURT:  Okay.  Thank you for that.  I'll try to

7    speak maybe a little more slowly and clearly, and maybe

8    counsel can do that as well.  That might help with the audio.

9          So Mr. Kosloski, if you can administer the oath.

10          THE DEPUTY CLERK:  Sir, if you can please raise your

11    right hand.

12          JONATHAN MARKS, a witness herein, having been first

13    duly sworn, was examined and testified as follows:

14          THE COURT:  All right.  Thank you.

15          Mr. Boyer, you may proceed.

16          MR. BOYER:  Thank you, Your Honor.

17    (Jonathan Marks testified via Zoom)

18                        DIRECT EXAMINATION

19    BY MR. BOYER:

20    Q.  Good morning, Mr. Marks.  Could you briefly introduce

21    yourself to the Court.

22    A.  Good morning.  Yes.  My name is Jonathan Marks.  I'm the

23    Deputy Secretary for Elections and Commission at the

24    Pennsylvania Department of State.

25    Q.  And how long, Mr. Marks, have you been the Deputy

1    Secretary of Elections for the Department of State?

2    A.   I have been Deputy Secretary for about five-and-a-half

3    years, since February of 2019.

4    Q.   And can you describe what your responsibilities are in

5    that role?

6    A.   So my responsibilities include overseeing three bureaus.

7    One is the Bureau of Elections.   The other two are the Bureau

8    of Notaries and Commission, as well as the Bureau of Campaign,

9    Finance and Lobby Disclosure.

10   Q.   Okay.   And can you also describe, Mr. Marks, the

11   Department of State responsibilities with respect to

12   administering elections in Pennsylvania?

13   A.   So the Department of State, though it does not have a

14   direct role in most cases in administering elections, it does

15   have some oversight and it serves as a resource for our 67

16   Board of Elections.

17        So, for example, the department, and the reason we are

18   here today, is the one thing we do is ballot access for

19   statewide in federal and state level candidates.

20        We also provide candidate lists to our county Boards of

21   Elections prior to each election, outlining those statewide

22   federal and state level legislative candidates or judicial

23   candidates as the case may be.

24        We also provide training resources to our county Boards of

25   Elections to ensure that they understand the requirements of

1   the statute as it relates to their responsibilities, and we do

2   certified voting systems in Pennsylvania, and counties can

3   choose among any of the certified voting systems to conduct

4   their elections.

5       We also provide online resources, not only to county

6   Boards of Elections, but also directly to voters on our

7   website as well.

8   Q.  I believe you said, Mr. Marks, that the Department of

9   State doesn't directly administer elections.  Who does if not

10  the Department of State?

11  A.  Each of the 67 county Boards of Elections administer

12  elections in their individual counties.

13  Q.  Can you describe what their direct election administration

14  entails?

15  A.  Well, they pretty much do the bulk of election

16  administration and that starts with, you know, preparing the

17  voting systems that they use and that process starts well in

18  advance of election day.

19      So, you know, counties will take the list that we provide

20  of authorized candidates in municipal election years.  They

21  actually create the list themselves, and they will begin

22  setting up their ballots for the upcoming election, and then

23  that process winds on for weeks as they do additional

24  preparatory steps, which include testing of the voting

25  equipment, printing of the ballots, printing and mailing of

1    absentee and mail ballots, and they also conduct poll worker

2    training in those weeks leading up to election day and,

3    ultimately, they are responsible for delivering all of the

4    supplies to each of our 9,000 plus polling places in the

5    Commonwealth so that the poll workers that work in each of

6    those individual precincts have all of the materials and

7    equipment they need to conduct election day voting at those

8    polling places.

9    Q.   Okay.  And it's fair to say there's a lot for counties to

10   do.

11   A.   There is, and that was a very succinct version of all of

12   the various things they do.

13   Q.   Is every county uniform in how it administers those

14   elections?

15   A.   They are not.  Certainly there are -- the statutes are

16   uniform that they operate under, but in terms of the conduct

17   of the election, counties -- there are some variations in how

18   counties conduct election.

19        Probably the first thing, the most obvious thing,

20   Pennsylvania does not have a statewide voting system.  We, per

21   the Pennsylvania election code, examine and certify voting

22   systems for use of the Commonwealth, and then the counties

23   make their own choice as to which of those systems they will

24   use.  The only requirement is that they must choose from one

25   of the certified systems.

1      Currently, there are five vendors who have voting systems

2      certified in the Commonwealth of Pennsylvania.

3      Q.  And are all five of those systems at use in at least one

4      county in the Commonwealth?

5      A.  Yes.

6      Q.  Can you describe some of the differences from one system

7      to another?

8      A.  Yes.  So we -- at a very high level, there are two, sort

9      of basically two different types of voting systems.  There is

10     the type of voting system where voters on election day will be

11     marking a pre-printed paper ballot by filling in ovals next to

12     their candidates of choice.  That is the overwhelming majority

13     of our counties use that type of system.

14         And then the other sort of at a high-level type of system

15     is a voting system where voters on election day will use a

16     ballot marking device, which is a touch screen that they make

17     their selections on, and they will print out a ballot that has

18     been marked by the ballot marking device and insert that into

19     the scanner.

20         So basically the two types at eye level are hand marked

21     ballots that are fed into the scanners versus machine marked

22     ballots that are fed into the scanner.

23     Q.  Okay.  Just so I understand, with the hand marked

24     machines, those machines work with an actual ballot that has

25     been printed at some point ahead of election day; is that

1   correct?

2   A.   That's correct, yes.

3   Q.   Okay.  Are the counties themselves responsible for

4   printing those ballots?

5   A.   They are responsible for printing the ballot, yes.

6   Q.   And do they do the printing themselves?

7   A.   No.  To my knowledge, each of the 67 county Boards of

8   Elections uses a print vendor, whether it's a local vendor or

9   a natural print vendor.  Each of them use a print vendor that

10  will print their ballots.

11       There's a handful of counties who have ballot on demand

12  systems, but based on the information, based on information

13  I'm aware of in discussions with them over the past few years,

14  they are primarily using that ballot on demand for

15  over-the-counter absentee and mail-in voting by voters.  They

16  are still relying to some extent on a ballot printer.

17  Q.   Does every county have a different vendor?

18  A.   No, there are counties that use the same print vendor.

19  Again, that is a county choice.  There are a handful of

20  counties that use local print vendors that print to the

21  specifications provided for or provided by the voting system

22  vendor.

23       There are also large vendors, like Election Systems

24  Software, Phoenix Graphics.  William Penn Printing located

25  actually out there in Pittsburgh prints ballots for I think

1  two dozen or a little over two dozen of our counties.

2      So they don't each have their separate printers in all

3  cases.  Some of them rely on the same vendors that print for

4  other counties.

5  Q.  And in the course of your responsibilities as the

6  Department of State election director, do you ever have

7  conversations with any of the print vendors that serve

8  counties?

9  A.  Yes, I do.  I have fairly frequent conversations with

10  print vendors.  Earlier this year, I had a call with each of

11  the print vendors after our primary to talk about planning for

12  the November election to understand what their limitations

13  were, what their concerns were, and since then I have been in

14  contact with them to answer their questions and also provide

15  information from the department regarding the progress of

16  elections leading up to this November's election.

17  Q.  Okay.  In your position, do you also work with county

18  election officials as they go through the various steps you

19  described to prepare for an election?

20  A.  Yes, I do.  In my role, I -- so I do two things, though I

21  have a lot of conversations with individual counties.  Every

22  two weeks I host an office hours call that is open to all

23  counties.  We usually have, you know, half or two-thirds of

24  the counties join those office hours meetings.

25      I talk to the -- we have two county election director

associations in Pennsylvania, one for the eastern half of the

state and one for the western half of the state, and I talk to

the two chairs of those associations on a more frequent basis,

and then in between then, I may have individual conversations

with individual counties.

Q.  So let's start with the office hours.  Can you describe

what types of issues you discuss with county officials during

those periods?

A.  We discuss the department's guidance.  We discuss sort of

the status of what the department is doing.  So over the past

couple of months, we have discussed preparations for election

day, whether that be upcoming training that the department may

offer, changes to guidance based on either best practices or

some litigation, and we also discuss as we -- after the August

1st deadline for minor political parties and political bodies

to file, we certainly discuss the status of the candidate list

as we work towards finality there.

Q.  I believe you said you, outside of the office hours, also

have more ad hoc conversations with county officials; is that

right?

A.  That's correct, yes.

Q.  What type of issues do you discuss during those meetings?

A.  It runs the gambit.  A lot of times it is based on a

question a specific county may have or specific counties may

have.

1      I actually accompanied the Secretary on several of his

2   visits to counties.  So we were sitting in the county election

3   office just talking about what their concerns are, what their

4   questions are regarding election administration, and that can

5   be, you know, questions about some specific guidance that we

6   may have issued, concerns about sort of their timeline and

7   their capabilities leading up to election day.

8      Certainly one of the things that we discuss for several

9   weeks as nomination paper objections were working their way

10  through the Commonwealth Court and then ultimately the Supreme

11  Court, you know, we were getting questions about the status of

12  the list of candidates and we were reminding counties that

13  irrespective of that status, they still had hard deadlines for

14  certain types of absentee voters like military and oversea

15  civilian voters.

16     So it really depends on what is going on at a particular

17  point in the election cycle.  That's kind of what drives our

18  discussions and the questions that are coming from counties.

19  Q.  Okay.  And if a county is having some sort of -- any sort

20  of issue with respect to preparing for the election or

21  election administration, do they ever bring that to your

22  attention?

23  A.  Yes, we -- in addition to me, we do have individuals on

24  the department's staff.  We call them county liaisons.  They

25  are sort of the first point of contact.

1      So a county is always welcome to contact me, but if they

2   need to get ahold of somebody immediately, we have actually

3   assigned staff members to counties so that the county has sort

4   of an initial point of contact they can reach out to with a

5   question or a problem.

6   Q.  And do you know how often county officials are reaching

7   out to their DOS liaison?

8   A.  No, not all 67 counties are reaching out to their

9   liaisons.  Every week, based on what I observed, our county

10   liaisons are generally, many of them are talking to some or

11   all of their counties on a weekly basis.

12   Q.  Okay.  And if a county reports to their DOS liaison an

13   issue, will that ever get elevated to your attention?

14   A.  It will depending on the issue.

15   Q.  Okay.  Does the Secretary expect you to know what's

16   happening statewide as counties prepare for an election?

17   A.  I want to make sure I heard -- you're asking if the

18   Secretary expects me to know what status of things are in

19   counties?

20   Q.  Yes.  I can ask the question again for clarity.

21      Does the Secretary expect that you know what is happening

22   statewide as counties get ready to administer an election?

23   A.  Yes.

24   Q.  Okay.  Now, I believe you said one of the responsibilities

25   of the department in terms of election administration is

1   finalizing the list of candidates that will appear on a

2   general election ballot; is that right?

3   A.   That's correct, yes.

4   Q.   Okay.  And has that already happened for the 2024 general

5   election?

6   A.   Yes, it has.

7   Q.   And do you know when that happened?

8   A.   I believe it was the middle of September.  I want to say

9   September 16th.  I don't have it right in front of me.

10  Q.   For what it is worth, September 16th is consistent with my

11  understanding as well.

12  A.   Yes.

13  Q.   So can you walk through the steps between when the

14  Secretary certifies the list of candidates and the election

15  day, what needs to happen to get ready for the election?

16  A.   So because all of our county or most of our counties are

17  now using voting systems that require the hand mark paper

18  ballot, what will happen once we certify that list, counties

19  will finalize their election definition in their election

20  management system.

21       So each of the voting systems has sort of a central

22  software program that county election officials use to define

23  the offices and contests, as well as the candidates and ballot

24  styles that go into a specific election.

25       So counties will often start that process before we

1  certify the list of candidates so they can start inputting

2  that information.

3      Once we certify that, sort of the first step is counties

4  will finalize that ballot definition, they will then begin

5  working with their print vendors first to get proofs and then

6  sample ballots and test ballot decks that they can use to test

7  their voting equipment.

8      So it kind of goes through this progression, and they will

9  then conduct some level of ballot acceptance testing before

10 they send out absentee and mail ballots to make sure that

11 those ballots are going to be -- can be properly tabulated,

12 and then it moves on from that point to receiving test decks

13 from their print vendor and conducting logic and accuracy

14 testing on all of the equipment used in the county.

15     So for most counties, that involves feeding those test

16 decks through the scanners that will be located in precincts

17 on election day, as well as central scanners or central

18 tabulators that may be used for absentee and mail ballots.

19     And then as part of that, they will do some level of

20 functional testing on the actual hardware, the equipment

21 itself that goes out to the polling place and, ultimately,

22 that will end with them locking and sealing the voting

23 equipment for delivery to polling places on election day.

24     So once they have completed all of their pre-election

25 testing and everything is set to go, they lock and seal all of

1    the voting equipment, and that remains locked and sealed and

2    secured at the county until it is delivered to the polling

3    place.

4        In between all of that, in a presidential election cycle

5    such as this one, they are also processing voter registration

6    applications that are coming in, additional requests for

7    absentee and mail ballots.  As I mentioned earlier, they are

8    conducting poll worker training in the weeks leading up to

9    election day as well.

10       So as they are doing all of that pre-election testing,

11   they are also doing these other tasks that are higher volume

12   particularly in a presidential cycle.

13   Q.  Thank you, Mr. Marks.  So there was a lot in there, so I

14   want to try to break out a couple of those pieces and talk

15   about them more specifically.

16       I believe one of the steps you mentioned in that process

17   was something referred to as logic and accuracy testing; is

18   that correct?

19   A.  That's correct, yes.

20   Q.  Okay.  And is that ever also referred to as L&A testing?

21   A.  Yes.

22   Q.  Okay.  So if I say L&A testing, you know I'm referring to

23   logic and accuracy testing?

24   A.  Yes, that is the acronym we use to describe logic and

25   accuracy testing.

1   Q.  Okay.  Can you explain in a bit more detail what logic

2   accuracy testing is?

3   A.  At a very high level, logic and accuracy testing is a

4   pre-election testing that is conducted to confirm that all of

5   your offices, contests, candidates are correctly programmed

6   into the voting equipment and also that they're correctly

7   identified on the paper ballot component.

8       And then probably the core of logic and accuracy testing

9   is the process of feeding those, feeding the test decks that I

10  mentioned earlier through the tabulation elements of the

11  voting equipment to ensure that those tabulators are properly

12  tabulating the results from an election.

13      So the way this works, you'll create test decks with some

14  faux pattern.  Then you know what the outcome should be based

15  on that faux pattern.

16      You feed those through.  You -- just it's sort of like

17  what you will do after election day.  You feed those through.

18  There's -- you know, and then you feed them into the central

19  election management system to make sure that from start to

20  finish, that process is resulting in accurate tabulated

21  results.

22  Q.  So before I asked you about a couple of the components you

23  just referenced.  Does the department have any role with

24  respect to L&A testing?

25  A.  We did not have a direct role in conducting logic and

1    accuracy testing, but we do have an oversight role.  One of

2    the things that the Secretary of the Commonwealth has the

3    authority to do under the election code is to issue directives

4    regarding electronic voting systems, and one of those

5    directives is the directive on logic and accuracy testing.

6        So we provide training on best practices on how to conduct

7    logic and accuracy testing.  We also provide -- we also

8    require that at the completion of logic and accuracy testing,

9    each of the 67 Boards of Elections certify to us that they

10   completed logic and accuracy testing.

11   Q.  So I believe you said the Secretary's role is to certify

12   the machines, and under that is issued a directive requiring

13   logic and accuracy testing.

14       Is completing logic and accuracy testing a condition of

15   having a certified voting system in Pennsylvania?

16   A.  It is.  And though it is not referenced in Pennsylvania

17   election code, pre-election testing is also a statutory

18   requirement.

19   Q.  Okay.  And why does the department require counties to

20   conduct L&A testing?

21   A.  Well, again, its primary purpose is to ensure that the

22   equipment is in proper working order and that it is accurately

23   tabulating results for each election.

24       Counties need to go through that process in advance of

25   election day so that they can assure the public and candidates

1    who are represented on the ballots and political parties who

2    are represented on the ballots that the equipment is going to

3    properly and accurately tabulate votes that are cast on

4    ballots by millions of voters across the Commonwealth.

5    Q.   And can L&A testing begin before the list of candidates

6    has been finalized for an election?

7    A.   No, it cannot.  As I mentioned earlier, the election

8    definition files have to be finalized, and then you progress

9    from one step to the next.  So you are printing proofs that

10   you use to proofread everything that's on the ballot, and then

11   you -- using that data, you are also creating test decks that

12   will then be used for logic and accuracy testing.

13        So in order to get to that logic and accuracy testing

14   step, you have to finalize your general election ballot

15   definition files to complete logic and accuracy testing.

16   Q.   Okay.  Just so I can make sure we all understand what some

17   of these terms are, what is the election definition file?

18   A.   Again, that is the -- it's basically the framework of an

19   election.  So the election definition file is all the offices,

20   contests, candidates, ballot styles, everything that goes into

21   setting up an election, it is that defined in a database.

22   Q.   And I think once you said -- I believe you said once you

23   have the election definition, you create the test decks; is

24   that correct?

25   A.   Yes, because, again, the overwhelming majority of our

1    counties are using hand mark paper ballots.  On election day,

2    counties are creating test decks that will be used for logic

3    and accuracy testing.

4        So the way logic and accuracy testing works is that you --

5    in order to properly test the equipment, you have to run test

6    ballots through that equipment, and the way it works, you have

7    a, sort of a vote pattern that you've decided in advance that

8    will robustly test the tabulating elements.

9        That's how you determine what ballots are going to be on

10   the test deck, and then you feed those through the equipment

11   and compare what the expected results are against the results

12   that you actually get when you complete the logic and accuracy

13   testing to ensure that they match.

14   Q.  Okay.  So if I understand correctly, a test deck is

15   effectively sample ballots that are used for the logic and

16   accuracy testing?

17   A.  Correct.

18   Q.  Okay.  For logic and accuracy testing, do counties only

19   test some of the equipment that they are going to use in an

20   election?

21   A.  I'm sorry, I missed part of that.  Do counties --

22   Q.  Sure.  Do counties test -- during logic and accuracy

23   testing, do counties test every single piece of equipment that

24   they will use for an election?

25   A.  Yes.  Our directive requires them to test each piece of

1    equipment.  So in the overwhelming majority of counties,

2    again, you have tabulators that are attached to a ballot box,

3    and voters are feeding those ballots through the tabulators.

4    So you have to run test ballots through each of those

5    tabulators to ensure that they are accurately tabulating and

6    to ensure that the equipment is in working order.

7    Q.  Are there any types of machines apart from tabulators that

8    need to be tested as well?

9    A.  So in those counties that use ballot marking devices on

10   election day, which is, I think it is about ten counties, they

11   also have to do testing on the ballot marking device, and

12   going back to my earlier testimony, those ballot marking

13   devices are used by voters on election day to make their

14   selections, and then a machine mark ballot is printed out and

15   that is then fed through the scanners.

16       So counties that use ballot marking devices as their

17   primary voting method on election day have to go through

18   functional testing.

19       I will note that every county in the Commonwealth for

20   accessibility purposes has to have at least one ballot marking

21   device in each precinct.  So every county is doing this at

22   some level, but those counties that are relying on it as their

23   primary voting method are doing a lot more of that sort of

24   functional testing of the ballot marking device.

25   Q.  In some of Pennsylvania's larger counties, do you know how

1   many machines that they would have to test as a part of the

2   logic and accuracy testing?

3   A.  I think in Philadelphia, which has 1700 divisions, I

4   believe they have upwards of 4,000, between 3500 and 4,000

5   voting machines, and Allegheny, the second largest

6   jurisdiction, has a few thousand pieces of equipment as well.

7   Q.  Okay.  And in those larger counties, do you know how long

8   it takes to complete logic and accuracy testing?

9   A.  My understanding is that it took Philadelphia County a

10  week to do the logic and accuracy testing component.

11  Philadelphia County is one of those counties that actually

12  uses ballot marking devices as their primary system.  It took

13  them a week to do logic and accuracy testing, and then I

14  believe the better part of another week to do the functional

15  testing on the ballot marking devices.

16  Q.  Okay.  Before counties can even begin logic and accuracy

17  testing, do they have any requirement to provide advanced

18  public notice of when testing will begin?

19  A.  They do.  They have to provide -- they are actually

20  required, as I recall, to provide notice specifically to the

21  political parties, political body represented on the ballot,

22  as well as any other organization that notifies them in

23  advance.

24      So they have to provide notice directly to those groups,

25  as well as public notice of the date and times when to conduct

1    the logic and accuracy testing.

2    Q.   Okay.  Once a county completes logic and accuracy testing,

3    what do they do with the machines?

4    A.   Once they have completed logic and accuracy testing and

5    functional testing as necessary, they will lock and seal the

6    voting machines in advance of election day, and those machines

7    will remain locked and sealed, and the way this works in

8    practice, counties are using, you know, approved locks, and

9    they are also using tamper evidence seals over all of the

10   ports and the locks so that if somebody attempts to open that

11   equipment after testing has been completed, it will be

12   apparent that somebody tampered with the voting equipment.

13   Q.   Okay.  Is there a deadline to complete logic and accuracy

14   testing?

15   A.   We require, through the directive, counties to submit

16   their logic and accuracy testing affirmation by 15 days before

17   each election.

18   Q.   Okay.  If a new candidate was added to a ballot, would

19   counties have to redo logic and accuracy testing?

20   A.   Yes, they would have to, because they would have to make a

21   change to the election definition.  So the list of candidates

22   is one of those components of the definition of an election.

23        So making that change would necessarily require them to go

24   through another round of logic and accuracy testing to ensure

25   that votes are still being tabulated accurately.

1    Q.   Okay.  And are you aware is any county for the 2024

2    general election already begun logic and accuracy testing?

3    A.   Yes.  I mentioned Philadelphia.  I know they did theirs a

4    couple of weeks ago.  I believe Allegheny has completed logic

5    and accuracy testing.  Several other counties, to my

6    knowledge, have completed logic and accuracy testing as well,

7    and I know based on recent conversations with counties, that

8    many of them are -- if they haven't completed it, they are in

9    the process of completing that.

10       I believe Lebanon County, for example, completed logic and

11   accuracy testing a couple of weeks ago.  Not every county has

12   submitted the affirmation to us yet, but my understanding is

13   that a number of counties have completed logic and accuracy

14   testing, and additional counties are in the process of doing

15   that now as well.

16   Q.   Okay.  So if for any reason a county had to redo logic and

17   accuracy testing, are there any steps that would have to take

18   place before they could even begin the process of re-doing

19   that testing?

20   A.   Yes.  In the overwhelming majority of counties that use

21   pre-printed ballots that are marked by hand, those counties

22   would have to run another set of test decks to complete the

23   logic and accuracy testing test.

24   Q.   Would they have to unseal the machines if they already

25   completed testing?

A.   Yes.   If they have locked and sealed the machines, they would have to unseal them.   Basically they would repeat the process again and go through another round of logic and accuracy testing and then, again, seal the machines in advance of election day.

Q.   Okay.   So if they had to redo it, they would have to basically restart again from the very first step?

A.   Correct, yes.

Q.   Okay.   What are the risks if logic and accuracy testing is not completed before an election?

A.   One of the risks if logic and accuracy testing is not completed before the election, well, the risk is that there was an error made in the ballot definition file, and that logic and accuracy testing is designed to catch those types of errors.

So that the risk is that you -- by not conducting logic and accuracy testing, the risk is that there will be a malfunction on election day or vote titles will not be tabulated accurately.

Q.   Are the risks if logic and accuracy testing has to happen under a compressed schedule?

A.   Yes.   I mean, any time you do a process that normally takes several days in a very compressed period of time, you are putting the process at risk because you're rushing through that or you are doing less than you would normally do.

1   Q.  Okay.  And correct me if I am wrong, I believe you said

2   earlier that in the larger counties, the poll process might

3   take more than several days, but could, in fact, take closer

4   to two weeks; is that right?

5   A.  So I used Philadelphia as the example, and this election,

6   I believe it took a week to do the logic and accuracy testing,

7   and then another, nearly another week to do functional testing

8   on the ballot marking devices.  So I would think it would take

9   Philadelphia, for example, another week.

10  Q.  Okay.  If counties had to redo logic and accuracy testing,

11  do you think it would increase the risk of other problems for

12  the upcoming election?

13  A.  You know, I think it goes back to the compressed time

14  schedule.  If they are re-doing that in a compressed period of

15  time, it does increase the risk.  We already have a lot of

16  ballots that have been sent out as well.

17      So we are talking about a change after a point in time

18  where voters are already receiving and, in some cases,

19  returning ballots.  So there are a lot of risks and logistical

20  concerns at this point in the process.

21  Q.  So let's transition to the topic of ballots that have been

22  sent out which you just mentioned.

23      Is it true that ballots have already been sent to voters

24  for the 2024 general election?

25  A.  Yes.  In I believe over half of the counties have made

1    absentee and mail ballots available to voters in their

2    offices.  I think last time I checked, it was 35 counties.  We

3    also, about two-thirds of the counties have sent ballots out

4    to voters.

5        The last time I checked this morning -- I get statistics

6    every morning -- it appears that over 1.1 million absentee or

7    mail ballots have already gone out in the mail and about

8    137,000 have actually been received, filled out and returned

9    by voters to their county election office.

10   Q.  Okay.  Just quickly, could you explain what mail-in and

11   absentee voters are?  I believe that's a term you referenced.

12   A.  Yes.  Absentee is something that the Commonwealth has had

13   for decades, and it is a mechanism by which a voter who will

14   be absent or has some disability, this is a mechanism for them

15   to vote.

16       Mail-in voting is a method of voting that was added by our

17   legislature in October of 2019.  It is basically no excuse

18   mail-in voting that every voter in the Commonwealth is

19   entitled to use if they wish to do so, and those were -- it

20   was enacted in October 2019, and the 2020 primary was the

21   first election in which that was available to voters.

22   Q.  Okay.  And for the upcoming general election, do you know

23   how many people have already applied to vote by mail-in or

24   absentee ballot?

25   A.  Looking at the report this morning, it was a little over

1.5 million approved applications.  So individuals who

requested and had their applications approved for either an

absentee or mail-in ballot.

Q.  Has the deadline to apply for an absentee or mail-in

ballot already past?

A.  The deadline to apply for an absentee or mail-in ballot

has not past.  That is a week before election day.

Q.  Okay.

A.  So the statutory deadline.

Q.  So that 1.5 million number could still increase?

A.  It could, yes.

Q.  Okay.  And just to make sure I have some of the other

numbers you mentioned correct, I believe you said 1.1 million

ballots have already been sent to voters; is that right?

A.  Yes.  Based on the data I have available, 1.1 million

ballots have been sent out to voters, over 1.1 million.

Q.  What data do you rely on for that number?

A.  So we are relying on either what counties have recorded in

statewide voters registration systems or on mail house vendors

data that we have available to us through the mail house

vendors.

Q.  Okay.  And I believe you said as well that over 30

counties already have ballots available on demand; is that

correct?

A.  Yes.  I believe that the number is 35.  So it's a little

1    over half of the counties have indicated that they have

2    over-the-counter voting by mail available at their county

3    office at this point.

4    Q.   Okay.  And can you remind me the number you said of how

5    many ballots have already been returned for the upcoming

6    election?

7    A.   As of this morning, it was a little over 137,000 have been

8    returned.

9    Q.   Okay.  And is the process of counties sending ballots to

10   voters ongoing, meaning tomorrow?  Will the number of ballots

11   sent be higher than it is today?

12   A.   Yes.  I think in the last week, we probably added about a

13   hundred thousand.  That number was significantly lower a week

14   ago.

15   Q.   Okay.  And is the process of returning ballots also

16   ongoing, such as the 117,000 I believe mentioned will also

17   increase each day?

18   A.   Correct, yes.

19   Q.   Okay.  Do counties also need to print hard copy ballots

20   for use -- for use of in-person voting on election day?

21   A.   Yes.  All but about ten of our counties that use ballot

22   marking devices as their primary voting method on election

23   day, all but that group of counties have to preprint ballots

24   that voters then mark by hand by filling it in.

25   Q.   How -- the counties that do have hard copy ballots at

1   polling places on election day, how many ballots do those

2   counties need to have printed for election day?

3   A.  Well, per the Pennsylvania election code, counties have to

4   print a hundred percent, ballots equal to a hundred percent of

5   their registered voters in each precinct, minus whatever

6   absentee and mail ballots have been requested.

7   Q.  Okay.  And I believe you said earlier --

8   A.  So it's basically every registered voter, they have to

9   print numbers equal to that.

10  Q.  And I believe you said earlier that counties often or

11  always use vendors for printing ballots, is that correct, for

12  election day ballots?

13  A.  Yes.

14  Q.  Are you aware, has the process for printing election day

15  ballots in Pennsylvania already begun?

16  A.  It has, yes.

17  Q.  Okay.  How do you know that it's already begun?

18  A.  Again, that's based on discussions either I have had

19  directly with counties or our liaisons have had during the

20  past few weeks as counties prepare for the November election.

21  Q.  Okay.  And do you know when printing of election day

22  ballots began?

23  A.  When it began, I think -- so the earliest discussion I had

24  was with one of the print vendors.  They began doing their

25  ballots in the third week of September.

1    So, and that print vendor is William Penn.  Because they

2 use such a large number of counties, they actually schedule

3 ballot printing for each of their county clients, and based on

4 our recent discussion, my understanding is they started

5 shortly after we certified the candidate list on September

6 16th, they already printed ballots for a number of their

7 clients and I believe that process is still ongoing.

8 Q.  I believe you said earlier you have specifically talked to

9 the print vendors about them, about their printing of ballots

10 for the 2024 election?

11 A.  Correct.

12 Q.  Okay.  And are you aware, do the vendors at Pennsylvania

13 counties use -- do they have any clients outside of

14 Pennsylvania?

15 A.  Yes.  So Phoenix Graphics -- so there are two vendors that

16 are located in New York, and one of the print vendors is

17 actually located in Ohio.

18    ES&S, Election Systems and Software is one of our system

19 vendors.  I know they -- some of the ballot printing is

20 conducted by William Penn and they may use other partners to

21 print ballots to their specifications, but the three that I'm

22 aware of that are located outside of Pennsylvania, two are

23 located in New York and the other one is located in Ohio.

24 Q.  Okay.  And they are serving clients both inside

25 Pennsylvania and outside of Pennsylvania?

1    A.   That's correct, yes.

2    Q.   I believe you said earlier -- actually, scratch that.

3         If every county had to reprint election day ballots

4    starting now, are you confident the vendors could actually

5    complete that by election day?

6    A.   I am not confident that that could be done by election

7    day.

8    Q.   Why not?

9    A.   Well, as I said, particularly the small vendor that I

10   mentioned earlier, William Penn, they have a large number of

11   clients.  They do not have the capacity to print ballots for

12   all of their clients simultaneously.

13        Phoenix Graphics, I believe their list of clients has

14   grown to 14 that they print absentee and mail ballots for.  I

15   don't recall if they do election day ballots for all of them.

16        But probably the biggest risk I see is that one vendor

17   that is serving over two dozen of our counties, I know based

18   on conversations that they do not have the capacity to print

19   ballots for their clients all at once, and that is why they

20   schedule it over the period of several weeks.

21   Q.   Okay.  So we talked about logic and accuracy testing and

22   ballot printing, and I believe when I asked you a while ago

23   about the list of tasks that need to be completed between

24   certifying the list and election day, you also mentioned

25   processing registration applications; is that correct?

1    A.   That's correct, yes.

2    Q.   Okay.  Can you describe what that entails for a county

3    election official?

4    A.   Well, it -- depending on how the application comes

5    through -- so we have -- there are different methods by which

6    a voter can or an individual can register to vote.  They can

7    register through voter -- voter applications, those are coming

8    in electronically.  They can register online.  Those are also

9    coming through electronically.

10        But in a presidential election cycle in particular, we do

11   see a large number of paper applications that come in and that

12   requires some data entry on the part of county officials.

13        There are a lot of voter registration drives that are

14   either mailing applications to potentially qualified

15   individuals or they're conducting in-person voter registration

16   drives, collecting applications from individuals, and

17   submitting them to county election offices.

18   Q.   Okay.  So just to make sure I understand you correctly, I

19   believe you said the month before a presidential election,

20   there's typically more registration applications coming in

21   then, say, October of 2023?

22   A.   Yes, certainly, there's -- 2023 is the municipal election

23   cycle, and, sadly, the interest in municipal elections in

24   Pennsylvania is much, much lower than the interest in

25   presidential elections and even mid-term federal elections.

Q.   Okay.  And are counties still processing mail ballot

applications?

A.   They are.  So counties are still receiving mail ballot

applications in addition to those lower registration

applications.

Q.   Okay.  I think you also said counties are still conducting

poll worker training; is that correct?

A.   Yes.  Depending on the size of the county, that some

counties are able to do their poll worker training during the

last weeks before election day.  A county the size of

Philadelphia actually starts in September, and they have, you

know, they have multiple sessions over the course of several

weeks.

Q.   Okay.  If counties had to redo logic and accuracy testing,

would that take resources away from processing registration

applications?

A.   It would, I would expect, take resources away.  You may

have specific staff that are in charge of the election

equipment to conduct logic and accuracy testing.

My understanding is that counties will use their election

staff to do the process of, you know, feeding the -- marking

ballots, feeding those ballots through the voting system units

to complete logic and accuracy testing.

Q.   Okay.

THE COURT:  Why don't we break here.  I don't know

1    how much more you have.

2           MR. BOYER:  I probably have about three more

3    questions.

4           THE COURT:  That's fine.

5    BY MR. BOYER:

6    Q.  If counties have to redo logic and accuracy testing, would

7    that take resources away from processing mail ballot

8    applications?

9    A.  I could not say that in every county that would be the

10   case, but I would think certainly in large counties that are

11   using significant portions of their staff to do logic and

12   accuracy testing, I believe it would.

13   Q.  Okay.  And if counties had to redo logic and accuracy

14   testing, would you expect at least in some counties that would

15   take away resources from poll worker training?

16   A.  Yes.

17          MR. BOYER:  Just one moment.  May I confer?

18          THE COURT:  Sure.

19      (The attorneys are conferring).

20          MR. BOYER:  No further questions, Your Honor.

21          THE COURT:  All right.  Thank you.  Why don't we

22   break then at this point.  The time is 11:07.  Why don't we

23   break for 15 minutes here and we will pick up on cross.

24          Mr. Marks, you'll still be under oath during the

25   break, and I would ask that you refrain from talking with

1    anyone about your testimony.

2            THE WITNESS:  Understood.  Thank you, Your Honor.

3            THE COURT:  Thank you.

4            THE DEPUTY CLERK:  All rise.  This Court is now in

5    recess.

6        (A recess was taken.)

7                        (In Open Court)

8            THE COURT:  You may be seated.  All right.

9    Mr. Marks, you're still under oath and, Mr. Haverstick, your

10   witness.

11           MR. HAVERSTICK:  Thank you, Your Honor.

12                    CROSS-EXAMINATION

13   BY MR. HAVERSTICK:

14   Q.  Good afternoon -- well, no, good morning, Mr. Marks.

15   A.  Good morning, Mr. Haverstick.

16   Q.  Nice to see you.  I know you can't or don't think you can

17   see me, but thanks for taking the time today.

18       Mr. Marks, late changes to ballots are common, are they

19   not?

20   A.  I'm sorry, you broke up --

21   Q.  Late --

22   A.  -- towards the end of that.

23   Q.  Late changes to ballots are common, are they not?

24   A.  They have occurred multiple times, yes.

25   Q.  In fact -- and for the sake of being transparent, I'm

 1    reviewing an affidavit you submitted in a case Corman v.

 2    Torres from 2018.  In 2014, a republican gubernatorial

 3    candidate was taken off the ballot 19 days before the primary.

 4    Do you recall that?

 5    A.  Yes, that sounds correct, yes.

 6    Q.  And in 2016, a candidate for U.S. Senate was reinstated

 7    and put back on the ballot one week before the primary?

 8    A.  I believe that's correct, yes.

 9    Q.  So I guess where I'm going with this is it's not an

10    absolute impossibility for the department or counties to

11    adjust ballots even very close to an election?

12    A.  It is not impossible, no.

13    Q.  It mostly is a question of resources and money.

14    A.  Is that a question, Counselor?

15    Q.  Yes, that's a question.

16    A.  It is those two things.  Since Act 77 was enacted, it is a

17    little more involved than that because we have that paper

18    ballot component.

19        Prior to Act 77, all about 14 counties in the Commonwealth

20    were using a type of voting system called a direct recording

21    electronic voting system where every voter was casting their

22    votes on a touch screen system and those votes were tabulated

23    electronically.  There was no paper ballot component.  So

24    things have changed substantially since enactment of Act 77.

25    Q.  And I want to ask about mail-in ballots in a moment, but

1    at least as far as hard ballots are concerned, it is not an

2    impossibility and may even be a strong possibility that they

3    can be adjusted close to an election?

4    A.   Certainly the election definition files can be adjusted.

5    Again, I don't think it is inconsequential, though, that you

6    have the paper ballot component because in a large number, the

7    majority of counties you are preprinting ballots before

8    election day.

9        So while I am saying it's not impossible, but it is

10   significantly different now than it was, say, in 2018 or 2016.

11   Q.   Before I get into the mail-in ballot questions, is it fair

12   to say as you sit here today, you can't give a precise answer

13   about where all 67 counties are in their printing process

14   either for mail-ins or for hard ballots; right?

15   A.   Not all 67, no.

16   Q.   Fair to say that you focused your testimony today on

17   Allegheny and Philadelphia Counties?

18   A.   Certainly in my testimony I used those as the two

19   examples, yes.

20   Q.   So it's possible that, at least in part, if the Court were

21   to order Dr. West to be put on the ballot, some counties might

22   be able to accommodate that more easily than others?

23   A.   I think that's fair, yes.

24   Q.   Now, I want to ask some questions about mail-ins and the

25   L&A process.

1    I'm correct, am I not, that in some counties, mail-in

2    ballots were sent out prior to the L&A process being

3    completed?

4    A.  Yes.  So L&A is primarily testing that is done for

5    election day.  So, and I want to be clear just so there's no

6    confusion.  Absentee and mail-in ballots are not the only

7    paper ballots that are printed in advance of election day.

8        Most, in fact the overwhelming majority of our counties

9    use pre-printed election day ballots with their type of voting

10   system.

11       But yes, the counties will do what's called ballot

12   acceptance testing to -- so when they print their absentee and

13   mail ballots, they'll go through a testing that is not

14   necessarily logic and accuracy testing, but ballot acceptance

15   testing to ensure that those absentee and mail-in ballots can

16   be read by the central tabulators.

17   Q.  The requirement that logic and accuracy testing be done 15

18   days prior to the election is not a statutory requirement,

19   it's a directive from the department; right?

20   A.  Yes, it is a directive.

21   Q.  And that directive, if I'm doing my math right, has, at

22   least consistent with your directive, a date of October 21st

23   for L&A to be completed?

24   A.  Yes.

25   Q.  We agree, given at least the parameters you talked about

1    for the City of Philadelphia, that even within that 15 days,

2    if a county was required to do or redo L&A, it probably could

3    accomplish that; right?

4    A.  It certainly could be accomplished.  They could do another

5    round of logic and accuracy testing.  Again, there are other

6    components of that, and certainly outside of Philadelphia, it

7    is different because those counties are not using ballot

8    marking devices, but I think it's fair that they can do

9    another round of L&A, at least at this very moment in time.

10   Q.  And again, for a lot of the 67 counties in the

11   Commonwealth, as you sit here today, you can't say precisely

12   where they are in the L&A process and even whether they

13   started it?

14   A.  I do not know for all 67 counties where they are in the

15   L&A process, no.

16   Q.  Am I right that the public announcement prior to the L&A

17   process is a two-day lag?

18   A.  I believe it is 48 hours that notice that must be

19   provided.

20   Q.  So the record is clear, if this Court was to order

21   Dr. West to be put on the ballot say this week, a county could

22   advertise that it was going to do the L&A process say again,

23   and that would only need two days to happen, and then they

24   could do or redo the L&A process?

25   A.  That is certainly possible, yes.

1   Q.  No county has locked and sealed yet, has it?

2   A.  I'm sorry, what was -- I missed the second half of that

3   question.

4   Q.  Sorry.  It may be me and the mic.  I have a loud voice.

5   A.  It was a little muffled toward the second part of your

6   question.

7   Q.  No county has locked and sealed yet, has it?

8   A.  I believe the counties that have completed logic and

9   accuracy testing have locked and sealed.  That would be the

10  next logical step, but I do not have firsthand knowledge of

11  that, no.

12  Q.  So you don't know as you sit here today whether any county

13  is locked and sealed?

14  A.  I don't know.  I don't have firsthand knowledge.

15  Q.  And certainly, can we agree that at least some of the 67

16  counties in the Commonwealth have not locked and sealed?

17  A.  I think that is fair to make that assumption, yes.

18  Q.  You may have answered this question, but I'll ask it again

19  just so I'm complete in my head.

20      It would be possible at this point for vendors to reprint

21  hard copy ballots for polling places?

22  A.  Without asking the vendors that question, I don't know the

23  answer to that, no --

24  Q.  So --

25  A.  -- because --

1    Q.  I apologize, go ahead.

2    A.  Because a lot of those vendors have clients not only here

3    in Pennsylvania, but also elsewhere.  I can't answer the

4    question as to whether they could reprint ballots for all of

5    their clients all at the same time essentially.  I just don't

6    know the answer to that.

7    Q.  You don't know the answer because you haven't actually

8    consulted with any of those vendors?

9    A.  Not about that specific question.  I do know that vendors

10   raised that as their -- when I spoke to them earlier this

11   year, vendors did raise that as one of their concerns, the

12   litigation that dragged on very close to the election and, you

13   know, each vendor has its own abilities and capacity.

14       So I'm simply saying I don't know the answer to the

15   question, whether all of the print vendors could print

16   another -- could print additional ballots for all of their

17   clients all at once.

18   Q.  Let me ask it another way and maybe rephrase your answer.

19       You can't testify today that any vendor would be unable to

20   reprint ballots if asked to?

21   A.  That's correct, I cannot.

22   Q.  And by the way, what prevents a county, or the

23   Commonwealth for that matter, from bringing in an additional

24   vendor if it had to?

25   A.  Well, I don't know that anything prevents them from doing

1    that.  I will say that because the ballots have to be scanned

2    by voting equipment, they -- the way this works in practice is

3    that voting system vendor will provide specifications.  So I

4    don't know that you could just choose any print vendor, if

5    that's what you are asking.

6        Typically, the vendors who do the printing have gone

7    through some level of sort of approval from the voting system

8    vendor saying, yeah, this vendor can print ballots to our

9    specifications.

10   Q.  Presuming --

11   A.  So I'm not saying it's impossible, but I'm also not trying

12   to make it sound simple where you can just go to any printer

13   to print ballots.  It's a little more sophisticated than that.

14   Q.  I understand that, and I get that you are not -- your

15   testimony isn't that we can run out to a Kinkos and get these

16   printed, but presumably if there are vendors to approve

17   ballots who weren't being used, the Commonwealth could hire

18   them, too, or the county can hire them, too?

19   A.  Yes, I think that's fair.

20   Q.  And on the question of resources, it's not uncommon for

21   counties to scale up for elections with more workers.  For

22   instance, it's happening in Luzerne right now where workers

23   are being hired on a temp basis to assist.  So it's not

24   unusual for this to happen; right?

25   A.  For counties to staff up, it's not unusual, no.

1  Q.  Let me ask a couple of questions to conclude, Mr. Marks,

2  on some other alternatives.

3      Now, we know that counties have until October 22nd to send

4  out mail-in ballots; right?

5  A.  Yes, two weeks before election day is October 22nd, that's

6  correct.

7  Q.  So if this Court ordered Dr. West on the ballot and there

8  were counties that hadn't printed mail-in ballots yet, it

9  would not be difficult -- it would not be impossible for those

10  ballots to be printed with his name on it?

11  A.  Yes, I will testify it would not be impossible.  It would

12  certainly be difficult at this point, but perhaps not

13  impossible.

14  Q.  Well, how about this alternative.  In counties where

15  mail-in ballots -- let me ask a foundational question first.

16      The department communicates via email with folks who have

17  received mail-in ballots; right?

18  A.  Yes, we do voter registration communications directly to

19  voters who receive ballots if we have an email address for

20  them.

21  Q.  Sure.  For instance, I voted by mail in Montgomery County,

22  my home county, and I got an email from the department saying,

23  "We've received your vote."  So you have the ability to do

24  those emails; right?

25  A.  Yes.

1  Q.  Would anything prevent the department from sending out a

2  notice to someone who voted by -- who sought a mail-in ballot

3  to alert that person that "Dr. West is now on the ballot, you

4  should know that."  You could send that notice if you

5  wanted to?

6  A.  We could.  I would certainly have to talk to our staff

7  both here in the department and our Office of Administration

8  about the logistics of that, but, yes, we could send a message

9  to voters.

10  Q.  And that wouldn't even require alteration of the ballot.

11  That's simply notifying a voter of the change in status and

12  letting the person know that Dr. West is now on the ballot?

13  A.  Yes, if it's a pure notification, yes, we could send

14  notification to voters to the extent that we have contact

15  information for all of them.

16  Q.  In fact, you could do the same thing, could you not, for

17  hard copy ballots.  I mean, the department has, for instance,

18  posted notice at polling places of last-minute changes; right?

19  A.  The department hasn't, but on occasions counties have

20  posted notice in voting booths at polling places on election

21  day notifying voters of some important information or some

22  change, yes.

23  Q.  So if it was literally impossible for a county this

24  week -- if Dr. West was added to the ballot, if it was

25  literally impossible for a county to change a ballot, there's

1    still a way that notification could be given to voters that

2    Dr. West was on the ballot at the polling place?

3    A.  Yes, it has been done before.  So I think counties would

4    have time to print and distribute notices for posting at the

5    polling place.

6    Q.  Mr. West, thank you.

7            MR. HAVERSTICK:  I don't have anymore questions for

8    this witness, Your Honor -- oh, yeah, sorry, you are

9    Mr. Marks, not Mr. West.

10           THE COURT:  All right.  Thank you.

11           THE WITNESS:  That's okay.  Mr. West is quite

12   accomplished, more accomplished than me.  So I'll take it as a

13   compliment.

14           MR. HAVERSTICK:  Thank you, Mr. Marks.

15           THE COURT:  Thank you.

16           THE WITNESS:  Thank you.

17           THE COURT:  Any redirect?

18           MR. BOYER:  Briefly, Your Honor.

19                        REDIRECT EXAMINATION

20   BY MR. BOYER:

21   Q.  Mr. Marks, you were asked I believe about a candidate in

22   2014 who was ordered to be removed from the ballot 19 days

23   before the primary.  Do you recall that?

24   A.  I do, yes.

25   Q.  Okay.  And I believe you were asked about another

1    candidate who was ordered added to the ballot in 2016, some

2    short period of time before the primary election.  Do you

3    recall that?

4    A.  Yes.

5    Q.  Okay.  Have there been meaningful changes in how elections

6    are administered between 2016 and today?

7    A.  There have, yes.

8    Q.  Can you describe what those are?

9    A.  Yes.  So I referenced earlier Act 77 in 2019, which

10   actually, at least in Pennsylvania, represented a see change

11   in the way elections were administered.  We now have this

12   mail-in ballot component that -- so in a typical presidential

13   election, for example, we may have 250 to 300,000 absentee

14   ballots prior to Act 77.

15       Now, in 2020, in November, we had over 2.6 million mail

16   ballots, though I don't know that we're going to approach that

17   number this year, but we're already at 1.5 million.  So you

18   have a lot more absentee and mail ballots.

19       The other significant change was that every county has

20   updated their voting system.  So as I mentioned earlier,

21   counties prior to 2020, all but 14 counties were using a

22   direct recording electronic type of voting system that did not

23   have a paper ballot component and certainly not a pre-printed

24   paper ballot component.

25       So that was a significant change the department issued and

erected in 2018 for counties to update their voting equipment.

Most counties did that in 2019.  There were a handful of

counties that didn't implement those new voting systems until

2020.

So the two biggest changes are statutory changes that

provided for no excuse mail voting and also the new voting

equipment that now has this paper ballot component.  So those

are probably the two most significant changes since 2016.

Q.  And was it -- when counties were using direct recording

electronic devices, how hard was it to make late changes to

those devices?

A.  I will say, relatively speaking, I'm not going to testify

that it's easy to make late changes.  It is never easy, it is

never perfect, and it is certainly never preferred and it is

error (sic) hard.

But, relatively speaking, it was easier with direct

recording electronic voting systems because you had to update

the election definition files.  You would have to do logic and

accuracy testing again, but that was largely automated.  You

did not have the paper ballot component.  You didn't have to

worry about ordering test decks, running them through

tabulators, and you didn't have to worry about, you know,

proofreading ballots and printing a hundred percent or ballots

equal to a hundred percent of registered voters.

So that's probably the most significant difference between

1    the two types of voting systems that were used then versus

2    now.

3    Q.   Okay.  Just to make sure I understand, when counties were

4    using direct recording electronic devices prior to 2019, the

5    counties that were doing so did not need to preprint ballots

6    for election day for those machines?

7    A.   Correct, there was no paper component.  There was a paper

8    report that printed out on election night, but votes were

9    recorded electronically on the touch screen.  They were also

10   tabulated electronically on those special units.

11   Q.   The testing that needs to be performed on direct recording

12   electronic devices, if I understand you correctly, is

13   different than the testing that needs to be used on the sorts

14   of devices that are now spread across the Commonwealth?

15   A.   Correct, yes.  The testing now has the paper ballot

16   component included in it.

17   Q.   Okay.  So is it fair to say changes to ballots -- excuse

18   me -- changes to a candidate list in 2024 are substantially

19   more difficult than they would have been in 2016?

20   A.   I believe that's fair, yes.

21   Q.   Okay.  If -- I believe you said that there's a world in

22   which it would be possible to add a new candidate to the

23   ballot today.

24       Would it be possible to add a new candidate to the ballot

25   two weeks from now and still complete logic and accuracy

1    testing in every county before election day?

2    A.  It would become exponentially more difficult as time

3    passes, and I want to be clear about my testimony earlier.  I

4    am not suggesting that it would be easy to do it today.  We

5    still have the issue of -- unless we completely ignore it, we

6    still have the issue of the 1.1 million plus ballots that have

7    already gone out.  We have the issue of, you know, ballots

8    that may have already been printed by the counties for

9    election day, all of the other components I testified about.

10       So I don't want to -- I don't want to imply that it's

11   easy.  My testimony was simply it's possible to do it at this

12   point.  Doing it two weeks from now, which would be very close

13   to the deadline by which counties have to send mail ballots,

14   in fact, I think it would bump right up against that deadline,

15   would certainly be more difficult, a lot more difficult than

16   it is at this moment in time.

17   Q.  Okay.  And from an administrative perspective, what

18   challenges would there be if there were 1.5 million people who

19   received a ballot with one list of candidates and some million

20   others that received a list of -- a ballot with a list of

21   different presidential candidates?

22   A.  Well, I would think, you know, the administrative

23   challenges, I'll set aside -- I'm not the attorney in this

24   room, so I'll set aside the potential legal issues with that,

25   but administratively I think the counties would have to have a

1    process in place to keep those groups of ballots segregated.

2        When we have had late changes and it's been necessary for

3    a county to accommodate that, as often has been the case, that

4    certainly would be our guidance to counties to keep those

5    different ballots segregated to preserve the record at the

6    very least.

7        So, you know, what is really different about now versus

8    then is, you know, we're not just talking about the different

9    types of voting systems.  We're also talking about a much

10   larger volume of ballots and sort of the logistics of

11   segregating them if that were to become necessary.

12   Q.   Okay.  And to back up just to make sure I understand your

13   testimony, I believe you said there's a world in which it

14   would be possible to complete all of the various steps we have

15   talked about this morning between now and election day.

16       If every county in Pennsylvania had to do so, would you

17   expect that the risk of election day problems would be

18   greater?

19   A.   I do, yes.  I mean, the idea -- as I said, it's never

20   easy.  It's never been easy.  It would certainly cause me

21   great concern if we tried to make a change at this late stage.

22   I would certainly be concerned about errors that may not

23   become apparent until election day.

24       I think -- at least it seems to me that's logical that if

25   you tried to fast or compress, you know, time lines that are

1    usually much longer than that, you open yourself up to

2    unforced errors.

3    Q.  And how long have you been with the department?

4    A.  With the department, 30 years.  Working in elections

5    specifically in a variety of capacities, over 20 years.

6    Q.  Are you aware of any prior presidential election in

7    Pennsylvania during which a presidential candidate was added

8    to the ballot after over a million ballots have already been

9    sent to voters?

10   A.  No.  This circumstance is unique in my career.

11             MR. BOYER:  One moment, Your Honor.

12             THE COURT:  Sure.

13             (Counsel conferring)

14             MR. BOYER:  Nothing further, Your Honor.

15             THE COURT:  All right.  Thank you.

16             Mr. Haverstick?

17             MR. HAVERSTICK:  Real quick.

18             THE COURT:  Sure.  Go ahead.

19                      RECROSS-EXAMINATION

20   BY MR. HAVERSTICK:

21   Q.  Mr. Marks, Matt Haverstick.  It's unique in your

22   experience that no candidate who has tried to get on as a

23   presidential candidate after mail-ins have gone out because

24   mail-ins only started being a widespread phenomena after

25   Act 77?

1     A.   That's correct, yes.

2     Q.   So this is only the second presidential election

3     essentially between 2020 and now where this possibility even

4     became a possibility?

5     A.   That's correct, yes.

6     Q.   And it is, again, talking about mail-ins being segregated,

7     which I think is what you referred to when you were talking

8     about ballots being segregated, that, in fact, has happened

9     multiple times since the advent of Act 77; right?

10    A.   Yes, but the volume of ballots has been much lower.   I

11    know there were individual counties that had some issues, but

12    we're talking about hundreds of -- I think the most may have

13    been 29,000 ballots that had to be segregated in one county.

14    Q.   There was --

15    A.   The volume was certainly a lot different.

16    Q.   Well, it would only be significant in counties where some

17    ballots had gone out and a reprinted ballot went out.   If

18    there was no reprinted ballot that went out, it wouldn't be a

19    problem, would it?

20    A.   I wouldn't say it wouldn't be a problem, but if your

21    question is if the change is made and there's no consideration

22    for ballots that have already gone out or have already been

23    printed, I suppose that certainly would be easier than a

24    circumstance where you had to replace all of the ballots that

25    have already gone out.

1    Q.   Right.

2    A.   If that's your question.

3    Q.   And it is and you gave the answer.  This is a

4    consideration -- well, this is not a consideration if ballots

5    that already went out and were voted simply were accepted as

6    voted; right?

7    A.   I wouldn't say it's not a consideration, but it is

8    certainly -- it certainly becomes much easier if you do not

9    have to account for replacing ballots that already went out.

10   Q.   Thank you.

11           MR. HAVERSTICK:  No further questions, Your Honor.

12           THE COURT:  All right.  Thank you.

13           Anything further from the defense?

14           MR. BOYER:  No, Your Honor.

15           THE COURT:  I just had a couple quick questions to

16   understand the testimony, Mr. Marks.

17           Your testimony before logic and accuracy testing, I'm

18   just sort of curious on that.  What, if any, types of errors

19   would pop up during that process?

20           THE WITNESS:  Your Honor, if you are asking what does

21   the county do if an error pops up during the process?

22           THE COURT:  I guess I'm kind of asking more of what

23   are the common errors that you would see through that process?

24           THE WITNESS:  So, you know, the common errors would

25   be misspelling of a name, for example.  Or you may have a --

1    you know, generally these things are set up kind of like a --

2    I'm trying to think of a nontechnical way to describe it, but

3    you are programming these and there are columns or rows that

4    are associated with a candidate for purposes of, you know,

5    printing the paper ballot component and also calibrating the

6    tabulator.

7          If an error is made in doing the election definition,

8    you could have a situation where it either incorrectly

9    tabulates the votes or it doesn't tabulate the votes at all

10   for a candidate, and that's really the purpose of logic and

11   accuracy testing, to make sure that you identify any of those

12   errors that have occurred, and we have seen a couple of

13   occasions over the last several years where a county may have

14   made a change in a municipal election, did not do -- you know,

15   they caught an error during logic and accuracy testing,

16   corrected it, but did not do adequate logic and accuracy after

17   that point, and as a result, there was a problem on election

18   day, and the one that I recall most readily, I believe,

19   occurred in North Hampton County where because of that change

20   in calibration with the touch screen, votes were not being

21   recorded for a candidate.  I want to say it may have been like

22   a magisterial district candidate, but those are the kinds of

23   things.

24         So it can be as simple as a misspelling or it could

25   be a situation where votes are either not being tabulated

1    correctly or not being tabulated at all for a candidate.

2         THE COURT:  Okay.  Another question I had, you

3    testified before about the vendors printing out the ballots to

4    send to the counties, at least the 57 counties that don't use

5    the machines.

6         Do those -- is there any process by which those

7    counties vet or check the ballots that they get from the

8    printer?  Do they go through each one by one or is there any

9    kind of sampling they do to make sure there's not a printer

10   error?

11        THE WITNESS:  Yes, the counties do go through a

12   process.  So I mentioned -- I think I used the term "proof."

13   So they will send -- they'll send the ballot definition files

14   to their print vendor, and probably the very first step would

15   be to get back proofs from that print vendor to make sure

16   everything checks out, that everything is aligned correctly

17   before they push forward with, you know, ordering the printing

18   of all of their ballots for the election.  So there is a

19   vetting process.

20        Before that, you know, I mentioned the voting system

21   vendors, kind of the relationship between the voting system

22   vendors and the print vendors.  They have specifications.

23        So often what you'll see is the voting system vendors

24   will say, these are our specifications, we have already

25   verified that these printers can print ballot stock to our

1   specifications.

2           So that's why you see counties using in many cases,

3   you know, multiple counties using the same vendor because that

4   vendor has already been -- the print vendor, because that

5   vendor has already been vetted by the voting system vendor.

6           THE COURT:  Okay.  All right.  Thank you.  I don't

7   know if there's any follow-up questions, counsel, has as to my

8   questions.  Defense?

9           MR. BOYER:  No, Your Honor.

10          MR. HAVERSTICK:  No, Your Honor.

11          THE COURT:  All right.  Thank you, Mr. Marks.  I

12  appreciate it.  You are excused.  You can stay on the line

13  also or hang up.  I appreciate it.

14          THE WITNESS:  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.

16          Mr. Haverstick.

17          MR. HAVERSTICK:  As a housekeeping measure, Your

18  Honor, plaintiffs would offer, because I think we're getting

19  ready to close the record, plaintiffs would offer the

20  affidavit of Paul Hamrick.  It's been provided to counsel for

21  the Commonwealth.  I don't know if they'll have objections to

22  it.  If they do, they'll tell you, and I can respond to those

23  if they have any.  And we have a set of stipulated facts that

24  one or both of us can submit to the Court.

25          THE COURT:  Okay.  Mr. Boyer.

1          MR. BOYER:  We did have a chance to look at the

2     declaration this morning and would object to it.  It is

3     largely legal conclusions, many of which are wrong.  There's

4     very little fact in it.  If he wants to pare it down to only

5     make accurate factual representations, we would be willing to

6     consider it, but as is, it's largely a legally incorrect

7     statement.

8          THE COURT:  Okay.

9          MR. HAVERSTICK:  Your Honor, the affiant,

10    Mr. Hamrick, is a lawyer, but naturally the Court is free to

11    disregard any legal conclusions.  I mean, we are not in front

12    of a jury.  You can disregard any supposed legal conclusions.

13    I'm sure, I agree, there are there, but, and accept it purely

14    for the statement of fact in the affidavit and -- because we

15    are in a TRO context and we didn't want to clog up the court

16    with trooping witnesses in or online, we thought that was an

17    easy way to get in the basis of facts.

18         THE COURT:  One thought would be -- I don't have that

19    particular declaration in front of me.  One option would be

20    have the plaintiff file it and I suppose maybe have a short

21    response filing so that I have both on file and then I can

22    give it whatever weight is appropriate based on the submission

23    and the objections.

24         MR. HAVERSTICK:  That's what we'll do.

25         THE COURT:  Okay.  Is that fine?

1      MR. BOYER:  Yes, Your Honor.

2      THE COURT:  And then I do have the joint stipulation

3  of facts.  I think also for purposes of the record if one of

4  the attorneys can file that just so it's on the docket as

5  well.

6      I also have the exhibit binder I received.  It looks

7  like Exhibits 1 through 11.  I'm not sure if these were

8  jointly prepared or prepared by one of the parties here.

9      MR. BOYER:  They were our exhibits, but they are all

10  exhibits to the joint stipulation.  My understanding is that

11  plaintiffs don't have an objection to them, but I will, of

12  course, let them speak if that's incorrect.

13      THE COURT:  Okay.  Any objections?

14      MR. HAVERSTICK:  No, we have no objection to the

15  admission of those documents.

16      THE COURT:  So I guess just from mechanics, if those

17  could be filed then as a supplement to the joint stipulation,

18  then they'll be included on the record, I would appreciate it.

19      Okay.  So with that, I certainly open it up to

20  argument if anyone wants to present any argument, and I guess

21  before we get into that, another maybe more sort of

22  housekeeping issue would be if anyone would be seeking to file

23  any kind of post-hearing submissions or brief, that would be

24  helpful to know now or counsel just plans to just present

25  argument here in lieu of anything or a combination of both?

1        MR. HAVERSTICK:  I suppose really it's what the Court

2   wants.  I was planning to present argument.  If we think

3   there's anything that wasn't addressed by me or that we would

4   like to respond to, since I assume we're not going to do

5   rebuttal or anything like that, we'd ask for the right to

6   submit something quickly and succinct.

7        THE COURT:  Okay.  Mr. Boyer, any thoughts on that?

8        MR. BOYER:  We are happy to follow the Court's leave.

9   If the Court feels argument today is sufficient, we're happy

10  to leave it there.  If the Court would like supplemental

11  briefing or if the plaintiffs want to file anything, I think

12  we certainly would like the chance to address the Court's

13  questions or arguments that might be raised.

14       THE COURT:  All right.  We'll start with argument

15  here and then play it by ear.

16       Mr. Haverstick.

17       MR. HAVERSTICK:  Thank you, Your Honor, and thank you

18  for the attention today.  This is an important issue

19  naturally, and we appreciate the Court making time when you

20  are trying to pool a jury and get something else done.

21       So I'm going to endeavor to be quick, although I

22  would ask the Court to acknowledge that -- and I don't know

23  how long counsel intends to argue, but I think there's been a

24  disproportionate amount of time used today for Mr. Marks and I

25  think we reached two hours.  I don't know if the Court is

1    tracking the time.

2         THE COURT:  Yeah, we are not.  We can provide an

3    update here.

4         THE DEPUTY CLERK:  Each side has used about an

5    hour-and-a-half.

6         THE COURT:  Okay.  About an hour-and-a-half by each

7    side.

8         MR. HAVERSTICK:  All right.  Your Honor, let me start

9    with getting what I think is a distraction, something designed

10   to draw your attention away from the real issue, and that's

11   the supposed delay issue.  It's been characterized a couple of

12   different ways throughout this litigation as laches or delay

13   or whatever they want to call it.

14        You heard today the kind of budget we're talking

15   about for the presidential operation for Dr. West.  It's a

16   shoestring.  It is not -- it doesn't have the resources to

17   engage in what a former colleague of mine on the bench in

18   Philly referred to as recreational litigation where, you know,

19   you are in court every time somebody coughs or somebody puts a

20   period on a sentence and you are fighting about it.

21   Nonetheless, I think the parties here moved with speed and

22   with appropriate care.

23        This issue sort of materialized in the middle of

24   July.  I've been litigating against my friends in the

25   Commonwealth long enough to know that had somebody come to

1    court in July before the August 1st absolute deadline for the

2    candidate affidavits or electors, we would have drawn a

3    standing objection, a ripeness objection, and would have spent

4    weeks litigating about that.

5         But more importantly in that in interim period, they

6    did what you want litigants to do.  They tried to self-help

7    and problem solve.

8         The parties on Dr. West's side were out trying to fix

9    the affidavits and ameliorate the problem that was flagged by

10   the department, and that is getting all 19 folks to actually

11   either submit their affidavits or submit the affidavits they

12   have to submit before they can withdraw, and there was a

13   mighty effort to get it done, and it came up short.

14        So shortly after it came up short in early August,

15   the litigation started, and there are lots of extension

16   reasons.  At that point Dr. West probably couldn't have come

17   in federal court, but if you think about, even if you say the

18   middle of July to now on an issue like this and when all the

19   facts actually materialized and crystalized the issues and the

20   problems, you have been on the bench long enough to know and I

21   have been doing this long enough to know, to be where we are

22   through one process all the way up to the Supreme Court of

23   Pennsylvania and now here in this court, we are moving pretty

24   quick.

25        I don't think this is an instance where under the

1   circumstances anybody can fairly be faulted for slowing things

2   down or taking too long once the actual issues materialized.

3   So that's what I have to say about that.

4           Now, that leaves us with our injunction test, and we

5   know there are four factors, and we have the burden on two.

6   They have the burden on two.  I know they don't agree with me,

7   and they don't agree with you because you have indicated in

8   opinions that the latter two elements of the injunction test

9   shift the burden over to the nonmoving party.

10          So let me talk about the ones where I think are --

11  certainly the ones we have the burden and what I think are

12  really the critical elements here.  Irreparable harm and the

13  likelihood of success on the merits.

14          Irreparable harm I think is easier of the two from an

15  explanation standpoint.  Take a look at really any election

16  law jurisprudence about what irreparable harm looks like for a

17  1st Amendment and a 14th Amendment claim, and this is sort of

18  sine qua non.  When you can't get on the ballot, when you

19  can't vote for who you want to, that's irreparable harm, and

20  that's -- I mean, I really don't think that's going to be

21  seriously debated by the Commonwealth, and I certainly think

22  the cases establish it.

23          That leaves us with likelihood of success on the

24  merits.  I imagine the Court is familiar with the

25  Anderson-Burdick test.  It's a balance test, and you balance

1    the burden against the hardship.

2         Now, let's say at the outset -- and I want to be very

3    clear about this at the outset -- we heard no evidence today

4    from the Commonwealth justifying any of the restrictions

5    placed on political body candidates to get on the presidential

6    ballot.  Not one bit of evidence.  You heard Dr. West testify

7    about some of the burdens.  Mr. Hamrick in his affidavit

8    factually talks about some of the burdens and, frankly, the

9    burdens are self-evident, and the Court can take judicial

10   notice of what statutory scheme requires for minor party

11   electors and minor party candidates to get on the presidential

12   ballot versus what it requires for democrats and republicans.

13   It's discriminatory.  There's no good reason for it.  And they

14   haven't offered one.

15        So I don't think -- I don't think they can at this

16   point as an evidentiary matter challenge the evidence

17   presented to you about the patent unfairness, frankly

18   discriminatory unfairness that prevents a candidate like

19   Dr. West or really any minor party or third-party candidate

20   from starting out a whole furlong behind the major parties in

21   trying to get on the presidential ballot, and I'm happy to go

22   through those with you, Your Honor, but I think our brief does

23   a good job of elucidating what they are, and again, they are

24   fairly self-explanatory.

25             THE COURT:  Can I ask you this?  I mean, in terms of

1    the argument that you are making that the state hasn't

2    proffered any type of countervailing interests, I guess the

3    question is do they have to as a factual matter, you know, if

4    it's a situation of a rational basis type of review, level of

5    review or even something higher, but let's just assume for

6    now, you know, lower level of review, and I agree with you

7    it's a burden of some kind -- you know, in other areas of the

8    law, it's kind of what the judge thinks is conceivable or

9    rational based on the structure here.

10          So it's more of a question of is that something

11   that's required, they are required to put on as a factual

12   matter here to win on the merits?

13          MR. HAVERSTICK:  Yes.  And let me explain why.  I

14   think when you look at the Anderson-Burdick test, I don't

15   think there's a -- I don't think there's a rational basis

16   component to it at all.  I think it's either an application of

17   strict scrutiny or an application of intermediate scrutiny,

18   and that depends on the burden.

19          And back to the burden, a severe burden which

20   requires them to put on evidence to satisfy a strict scrutiny

21   standard is certainly implicated in a case where you can't

22   vote for who you want to and you can't get on the ballot, and

23   I direct the Court to look at, for instance, the -- I think

24   it's the Patriot Party of Allegheny County case from the Third

25   Circuit in the late '90s where I think it articulates what a

1    severe burden looks like, and if you can't participate in the

2    political process at all, like you can't get on the ballot or

3    you can't vote for when you want to, that's a severe burden,

4    and they have to show up with evidence to explain, well, yeah,

5    we get that it's a severe burden, but this is why we can beat

6    a strict scrutiny test.

7           But even if the burden wasn't severe in this case,

8    they still have to satisfy a heightened scrutiny standard, and

9    they can only do that with evidence.  They can't just come in

10   as an ipse dixit and say, well, you know, the state did it,

11   and the state is presumed to be rational because there's no

12   rational basis test here.  So they have to do something, and I

13   think the something they have to do in this case, again,

14   because we're talking about a candidate who can't get on the

15   ballot and the 13,000 people who signed this petition can't

16   vote for him, that's a severe burden to their 1st Amendment

17   and 14th Amendment rights.

18          So my long-winded answer is, yes, Your Honor, they

19   have to put on some evidence explaining why this is something

20   the state needs to do or should do or has to do, and they

21   haven't.  They haven't talked about it at all.  They don't

22   talk about it really in their brief, and they certainly didn't

23   put on any testimony about it today.

24          Now, acknowledging -- well, I'm going to acknowledge

25   that -- the Court may not agree, but I'm going to acknowledge

1    that the burden shifts to them on the public harm and the

2    balancing of the equities test.

3         Nonetheless, in the interest of time and sort of

4    logical order, I'm going to present our arguments to the Court

5    on those now.

6         I think, again, of the two tests, public interests is

7    the easier to satisfy. There's a real life quote in the Kim

8    case that, you know, from earlier this year, that has

9    something to the effect of it's always in the public interest

10   to vindicate constitutional rights. I mean, that seems sort

11   of per force. Well, yeah, of course. So that leaves the

12   balancing of the -- or balancing the harms test.

13        The harm to Dr. West and, by extension, to the people

14   who want to vote for him and his vice president candidate are,

15   I think, plain. They can't exercise their 1st and 14th

16   Amendment constitutional rights and neither can Dr. West.

17        People who want to vote for Dr. West can't vote for

18   him. Dr. West, who wants to, by his own testimony, not just

19   win, he doesn't think he is going to win, but he wants to

20   contribute to the political discourse, he wants to push ideas

21   and get the major parties and other people thinking about

22   these ideas and considering them in the public square. He

23   can't do that in this forum because of the way the department

24   has chosen to interpret the election code.

25        So what does that leave the department with? Well, I

1  think it largely depends on how you characterize the relief

2  that we want, and this Court can put Dr. -- what we heard from

3  the department today is this is a disaster.  It's not

4  impossible, they'll never say it's impossible, because they

5  can't and, frankly, they shouldn't because they know it's not

6  possible.  But they characterize the harm in a way that

7  suggests it's a zero-sum game.  You either have to crater the

8  entire thing and start all over again or you just have to let

9  it go and, you know, yeah, the constitutional rights are

10  violated, but what are we going to do?  But that's a false

11  presentation of the options open to this Court in terms of a

12  remedy.

13         First of all, as Mr. Marks testified, they have no

14  idea of the state of affairs in all 67 counties of the

15  Commonwealth.  It may be eminently possible for some counties

16  to print mail-in ballots because they haven't completed it

17  yet, and it may be eminently possible for those counties to

18  print hard copy ballots that have Dr. West's name on them so

19  people can vote in precincts on election day.  I mean, we just

20  don't know.  We just don't know.  And it may not be that big a

21  deal to get Mr. West on the ballot in those counties and make

22  adjustments.

23         We also heard that even in places where it is a

24  little more difficult, it is going to cost money and it's

25  going to be hard.  But that happens every election, Your

1    Honor.  Every single election military ballots go out and

2    they're not complete and you got to figure out what to do

3    about it.

4         Every single election there are problems with ballots

5    that get litigated because Commonwealth Court maybe didn't get

6    done or Supreme Court didn't get done with the petition

7    challenges and there's flux in the ballots.

8         This is not an irregular process, and the department

9    is well-accustomed to figuring out how to put resources and

10   people behind it to make the elections work.

11        And I asked Mr. Marks very purposely, "Could there be

12   things that are done simply to alert voters that Cornel West

13   is on the ballot?"  And he said "yes."  And that seems to me

14   to be sort of self-evident and obvious.

15        We are not asking this Court today to fashion a

16   remedy to crater the entire thing and make the Commonwealth

17   start from scratch.  We are asking for a remedy that honors

18   what Dr. West asked for, which is participation in the

19   process.  And some participation is better than no

20   participation.

21        This is a case, Your Honor, where we shouldn't strive

22   for perfection, but the Court can strive to do what it can to

23   make Dr. West an option as best as the Court can and as best

24   as the Commonwealth can.  It's not going to be perfect.

25        We are not going to be able and we're not asking the

1    Court to ask people who have already submitted mail-in ballots

2    to have the right to go back and resubmit them or to have new

3    mail-in ballots be sent out if they've already been printed,

4    already been filled out, already been returned.  We're not --

5    we don't want that.

6            And if there's a legitimate basis that makes it

7    impossible for a county to reprint ballots, hard copy ballots,

8    then we're asking simply for notification for voters that,

9    Hey, Dr. West is an option.  You don't see him on the paper,

10   but he's an option there.  If you want to vote for him, write

11   him in.

12           I think why this case is so important, Your Honor, is

13   and, frankly, why all of the concerns about delay are really

14   hot air, is that it's part of a continuum of opening access to

15   third parties so they have the ability in future races, not

16   just this one.  We want some participation in this one, but

17   it's about the next one and the next one and the next one

18   after that.

19           And so we don't want perfection.  We know we can't

20   get it this time around, but there's things that this Court

21   can do and there's things that the department can do and

22   there's things that the counties can do to make it better than

23   it is today.  And that's all we want.  And that's all Dr. West

24   wants.  And I think probably, that's if you could ask them,

25   that's all the other minor parties and political bodies want,

1    a fair shake to participate in the process in a way that makes

2    sense.

3         So when you are balancing the equities, we're not

4    asking for the expenditure of zillions of dollars.  We're not

5    asking for the entire process to be halted and to be redone if

6    it's honestly too late to do it in that process.  We're just

7    asking this Court to fashion a remedy that does what it can.

8         Your Honor, I don't know if the Court wants to

9    entertain rebuttal.  I certainly probably have things I'd like

10   to say in rebuttal, but I also understand that we're on the

11   clock.

12        But I do hope the Court heard Dr. West, understands

13   why the restrictions on minor political parties and minor

14   bodies or political bodies trying to get on the presidential,

15   the presidential ballot is such an unfair issue, and it

16   certainly is violative of the constitution, and I hope, above

17   all, the Court asks and understands that we're not asking for

18   the whole thing to be blown apart.  We're asking the Court to

19   do what it can to let Dr. West participates in the process.

20   Thank you.

21        THE COURT:  Before you step down, I'll give a chance

22   for rebuttal.

23        MR. HAVERSTICK:  All right.

24        THE COURT:  So let's assume that I grant your relief.

25   Let's assume Dr. West wins, gets the popular vote.  How does

1   the presidential electors get sorted out with the 19 electors
2   at that point?

3       MR. HAVERSTICK:  I would say the same way that they
4   get sorted out for the major parties.  The major parties don't
5   have to way ahead of time identify who their electors are.

6       The major parties can pick democrats, republicans,
7   libertarians, greens, anybody they want to be their electors,
8   and they get to do it at the department's grace.

9       There's nominally a deadline 30 days after the
10  nomination, but the department -- let's backslide.  They say
11  get it to us as soon as practicable.

12      There's a way we could do it.  It can be -- we can
13  accommodate identifying the electors.  If it was as easy as
14  just getting -- and I don't, by the way, think that there's
15  any good reason Dr. West's electors have to sign candidate
16  affidavits and the major parties don't, but let's say the
17  Court says you still have to do the candidate affidavit.  I
18  believe it would be entirely possible, perhaps easy, to get 19
19  candidate affidavits now from electors who are willing to be
20  electors for Dr. West.  The problem, of course, is they had to
21  identify all 19 of these people a long time ago and, you know,
22  they changed their minds.  They get sick.  They -- one became
23  incommunicado.  Stuff happens.

24      But if we're allowed to participate in the process
25  the same way that the majors are, I think we could identify

1  19 electors within a day who would be willing to do it.

2      THE COURT:  Okay.

3      MR. HAVERSTICK:  Thank you, Your Honor.

4      THE COURT:  Thank you.

5      MR. BOYER:  Thank you, Your Honor.  As you heard this

6  morning, running a statewide election is a complicated

7  endeavor.  It involves thousands of actors, with advanced

8  preparation, getting ready for processing applications,

9  registrations in a presidential election, billions of ballots.

10  You can't just snap your fingers and make those happen, and

11  snap your fingers and be ready to administer a presidential

12  election.

13      Not surprisingly, given both how complex election

14  administration is and how important it is, election litigation

15  is different than an ordinary litigation, and it's different

16  in a couple of respects.

17      One, there's a principle, the common sense, laches,

18  whatever, that layer that's on top of any injunctive request

19  for relief, and we talked about who has what burden here.

20      I think the clearest distillation of the injunctive

21  standard when we are close to election, as we are here, is

22  from Justice Kavanaugh's concurrence in Merrill v. Milligan

23  and what he says in sort of explaining how the Purcell

24  principle applies is the plaintiff, if you are close to an

25  election, has to establish at least four things:  The

1    underlying merits are entirely clear-cut in favor of the

2    plaintiff, the plaintiff would suffer irreparable harm absent

3    the injunction, the plaintiff has not unduly delayed in

4    bringing the complaint and the changes in question are at

5    least feasible for the election without confusion, cost or

6    hardship.  All of those in election litigation are the

7    plaintiff's burden to establish.

8           Merrill v. Mulligan, as Justice Kavanaugh said,

9    relief was being denied because the underlying merits the

10   plaintiffs have failed to demonstrate were entirely clear-cut.

11   The plaintiffs have not established the changes are unfeasible

12   without significant cost, confusion or hardship.

13          In election litigation, it is the plaintiff's burden

14   to establish all four of those things.

15          THE COURT:  Can I ask you how do you square that with

16   Kim, the Third Circuit case, because I agree with you, I

17   actually thought that's a very helpful distillation of the

18   Purcell principal, probably the first time anyone has actually

19   done it in a way that makes any sense, and then when you read

20   Kim and the Third Circuit says, well, we just haven't

21   considered this, you are just supposed to kind of consider

22   this as part of the last two factors, I mean, how do you

23   square those I suppose?

24          MR. BOYER:  I think what happens in Kim is that the

25   plaintiff had met the standard, had met their burdens.  I

1    don't think, as I'll get to, that's happened here, but I don't

2    think Kim changes what needs to be shown and who needs to

3    show it.

4         And just to sort of finish the point about election

5    litigation being different, one of the ways in which it is

6    different is that by necessity, parties have to move fast.

7    There isn't time for leisure.  There are a huge number of

8    steps that need to be completed.

9         And just to give the Court a frame of reference for

10   how fast parties need to be moving, the required objections

11   period under state law, which is when a third party or a

12   political body has submitted nomination papers, that the

13   Department of State, in its review, has deemed, facially at

14   least, sufficient, objections have to be filed within seven

15   days, and there's a reason for that.  It's because further

16   delay compresses the period of time of what needs to be

17   completed between certification and election day in ways that

18   introduce intolerable risk, as I'll expand on.

19        That seven-day objection period is not an aberration.

20   Post election, if someone is challenging a county's decision

21   as far as the ballots are counted, they have two days.  These

22   are normal timelines for election litigation.  This isn't a

23   drawn-out process where there's an opportunity to sort of wait

24   and wait and wait.  If there is going to be an issue, it needs

25   to be raised.

1       So I do want to walk through three of the factors

2   that apply when there are requests for injunctive relief this

3   close to an election.  I'll take them a little bit out of

4   order starting with delay, talking about hardship, and then

5   finally finishing with the merits.

6       The question of delay has already been resolved in

7   this case by the Commonwealth Court.  Commonwealth Court had a

8   petition filed 15 days after the objection that said this is

9   just too late, or the objection was notified to -- was sent to

10  Dr. West's campaign on August 2nd.  On August 15th they

11  finally filed.  That is too long of a period of time.  Here we

12  are weeks later after weeks and months of more delay and that

13  consideration is no different here.

14      As you heard, as in the stipulated facts, Dr. West

15  had counsel as of June 2023.  As of July 11th, his nomination

16  papers had been rejected.

17      I know my colleagues said that we would argue there

18  is no standing, maybe he didn't have standing, but that's

19  squarely consistent with Third Circuit precedent in

20  Constitution Party versus Aichele, 757 F.3d 347.  The Third

21  Circuit resolved that political bodies do have standing to

22  challenge the requirements for the submitting nomination

23  papers even before they have been rejected.  If they have

24  sufficient declarations attesting to their intent, that was

25  enough to say there's standing.  So without question, by July

1    11th, there was standing.

2         Here, we are more than two months later with the

3    Commonwealth Court having already said that 13 days was too

4    long, and even if you set aside the period of time when things

5    were proceeding in Commonwealth -- and I'll get to that in a

6    minute -- the state court action was finally resolved on

7    September 16th.

8         Even from that point, we have a nine-day wait.  Nine

9    days in the context of an election administration is too long.

10   And, of course, you add that to the 13 days that they waited

11   from August 1st, you add that to the July period when they did

12   nothing -- as you'll see in the stipulation, they were on

13   notice of this requirement as early as June 7th and still they

14   waited and did nothing, all the while there was counsel

15   involved representing Dr. West's electors, representing

16   Dr. West.

17        So even if you completely carve out the period of

18   time where there were state court proceedings, we have over 20

19   days of delay when Pennsylvania's election code says you can't

20   move that slowly.

21        Although I don't think it -- I believe the Court can

22   decide there's an undo delay here even without the complete

23   inaction for the duration of the state court litigation.  They

24   referenced extension as a possibility, but just as Your Honor

25   did in 2020, a federal case could have been filed, extension

1   documents could have been applied, could have been stated the
2   second there was a state court's decision, we're here to go,
3   and just precisely what Your Honor did in 2020.

4         Moving to plaintiff's burden to establish that the
5   changes they want are feasible without cost, confusion or
6   hardship.  You heard no witnesses to say -- you heard no
7   witnesses today say that that's possible.

8         The standard isn't is there a world in which
9   something could be done.  The standard is is there a world in
10  which these changes could be made and, again, it's plaintiff's
11  burden to establish that without cost, confusion or hardship.

12        Before I get to the testimony today, we now have
13  three Pennsylvania state court decisions saying we are too
14  late.  We have the Williams' decision relating to electors,
15  and two on Saturday this week from the Pennsylvania Supreme
16  Court rejecting efforts to bring cases at this stage that
17  would have been far less disruptive than the relief requested
18  here, on betting it's just too late.

19        For a Federal Court, this would be directly contrary
20  to what the Supreme Court has repeatedly said are the
21  standards that apply here.  For a federal court to come in and
22  say, no, I disagree with the state courts, there is relief
23  available now, would be squarely contrary to what the Supreme
24  Court has repeatedly said the role of federal courts is this
25  close to an election.

1            So not only had plaintiffs not put on a single

2    witness to say that they can meet their burden, the changes

3    here are feasible without cost, confusion, or hardship.

4            What you heard from Mr. Marks is these changes would

5    cause immense cost, confusion and hardship.  Logic and

6    accuracy testing would need to be done on a compressed

7    schedule.  As he explained in response to Your Honor's

8    questions, doing so risks the possibility of machines not

9    tabulating votes correctly, not tabulating votes at all.  We

10   saw that issue in 2023 in the primary in North Hampton County.

11   These are real concerns and real risks, and we can't just toss

12   them to the side.

13           Ballots being printed.  You heard Mr. Marks saying,

14   you know, it's possible that the vendors wouldn't be able to

15   print it, and my colleague said, well, we just don't know.

16   "We just don't know" is not a good enough answer when their

17   burden is to say we need to show this is possible.  "We just

18   don't know" given the weight going forward with the election

19   administration or whether there might be other problems isn't

20   an answer to whether this change would cause significant

21   problems in the next four weeks.

22           Of course, as bad as things would be today, we are

23   still weeks away from the possibility of Dr. West being a

24   candidate.  If -- and this is the requested relief, probably

25   the only possible relief, the Department of State is ordered

to accept Dr. West's nomination petitions, that just begins
the state court objection process that every other political
body has been subject to.  It's a statutorily-required process
before a candidate can be certified, and that process exists
under 25-PS-2937.  There are seven days to raise objections to
a candidate.  There are certain, I think 1200 pages of
signatures that Dr. West's campaign submitted.  We have no
sense of what those signatures are.  There is a threshold that
needs to be met that at this point has not been shown has been
met.

So even if there's a showing here, it only means that
the Department of State would need to accept it, which then
begins -- the objections period for this year took six weeks,
and if you cut that even by a third, we're already two weeks
from election day, and everything that has been testified to
today needs to happen in two weeks, which is not possible.

Now, there was some reference in Dr. West's brief to,
well, you know, we could just forego that objections period
all together or, you know, the Court can change the rules.

I'm unfamiliar with anything that would permit a
court to just change state or a required state court procedure
without any claim that such procedures are unconstitutional or
violated any other legal principle; of course, doing so, every
other political body candidate was subject to the exact same
objection procedures would raise issues.

1    So as bad as it would be today, the changes wouldn't

2    even begin till several weeks from now at the earliest, and

3    then by that point, I think it would be fair to say everything

4    would be impossible.

5    Now, there was also a reference in their reply brief

6    from Dr. West that, well, DOS should have at some point begun

7    the objections period.  But the statutory obligation that the

8    DOS is under, 2936, is that no nomination's paper shall be

9    permitted to be filed if there's a material deficiency, as

10   there was in this case.

11   So I don't know where the DOS has unilateral

12   authority to begin a statutory process when its obligation is

13   that the papers can't be filed.  I'm not entirely sure where

14   that idea comes from.

15   Moreover, of course, at no point in the state court

16   litigation did anyone on Dr. West's side say, hey, well, let's

17   begin the objection period now.  There was never a reference

18   there.

19   So to the extent they thought that this should have

20   been happening long ago, the appropriate way to have dealt

21   with that would have been to ask someone in state court to

22   order that relief.  That didn't happen.

23   Now, on the last piece of this, the merits, again,

24   going back to the relevant standard that applies when the

25   federal court is asked to change state election procedures

1   this close to the election, it's not just a likelihood of

2   success standard.  As Justice Kavanaugh says, the merits need

3   to be entirely clear-cut.

4           The exact claims that are being raised by Dr. West

5   now have been raised in the state court proceedings in the

6   Klimer case were adjudicated by the Commonwealth Court of

7   Pennsylvania, and the decision affirmed by the Pennsylvania

8   Supreme Court.

9           I will address now in a moment why I think that was

10  the right outcome, but even if this Court has some

11  reservations, the fact that the State Supreme Court just

12  rejected the same constitutional argument made in here, I

13  think by itself supports the idea that the constitutional

14  claims here are not entirely clearcut, as is their burden to

15  establish.

16          Moving on from that, I think it is quite clear that

17  the state court in their resolution rejects the exact same

18  constitutional claim before this Court their resolution was

19  right.

20          Now, I'm not entirely clear what burden or what

21  provision Dr. West is challenging.  Sometimes it seems like

22  it's an affidavit requirement and sometimes it seems like,

23  well, it's just the requirement to name 19 electors at some

24  point, but in neither instance is that a significant burden,

25  and in both cases it is, we'll get to justify it by a

1    compelling interest.

2          As to identifying 19 people willing to serve as your

3    electors, I think it is, frankly, as minimal of a requirement

4    that can be asked of someone who wants to participate in the

5    presidential process.

6          If the candidate is to be on the ballot and have

7    people voting for them, it is imperative that they have 19

8    electors willing to vote for them, and Pennsylvania can send

9    to the Electoral College that Pennsylvania is fully

10   represented to participate in electing a president.

11         That process could have begun as early June 2023.

12   You heard that from Dr. West, announce his campaign, there was

13   no reason that it should have been -- that he could have

14   started at that point looking for electors so that when the

15   signature period began in February, he was ready to go.  And

16   as counsel just said a moment, it's incredibly easy to find 19

17   people, he thinks they could do it in a day.

18         We agree.  It's an incredibly minimal ask, and

19   there's no reason that a candidate with eight months to do it

20   suffered any great burden being able to find 19 people willing

21   to serve the role of presidential elector.

22         If it's the affidavit requirement that they are

23   challenging, it is a simple attestation of facts that the

24   Pennsylvania Supreme Court has repeatedly said is perfectly

25   appropriate to confirm a person is willing and able to serve,

1    and, of course, this case itself illustrates that it's

2    important, since both here and other places it's been reported

3    there were people being listed as Dr. West's electors who had

4    no idea or who didn't want to do so.  It's incredibly

5    important that Pennsylvania know that someone is going to be

6    on the ballot.  They had 19 people who are going to vote for

7    them should they win and, of course, as you also heard

8    Dr. West testified earlier, he intended to win.  If he was on

9    ballot, he intended to win.  If that's the case, it's

10   important that he habe 19 electors who then would be sent to

11   the Electoral College.

12        THE COURT:  Well, what about, I guess, the

13   plaintiff's argument that well, why?  Why do you need it for a

14   minor political candidate versus all the grace afforded to the

15   major political parties?

16        MR. BOYER:  Sure.  So as the Supreme Court has

17   repeatedly said, there are different considerations with major

18   parties and minor parties.

19        It is not unreasonable to impose normal requirements

20   for a political body to establish that it has sufficient

21   support and can do what is needed to get on the ballot if it

22   wins to have 19 electors.

23        That's true from Clements v. Fashing, 457, US 957.

24   It's true from Rogers V Corbett, which is 468 F.3d 188.

25   American Party versus White, 415 U.S. 767.  They are not

1    similarly situated.  Major parties are only major parties

2    because they have a long-standing documented history of

3    support.

4          The questions that might arise is, well, if you are

5    on the ballot, are you actually going to have 19 people,

6    aren't the same as the questions that arise from a political

7    body where it is important for Pennsylvania to know do you

8    have sufficient support to put on the ballot, you are on the

9    ballot and win, can you actually deliver 19 electors to the

10   Electoral College.

11         The courts that have distinguished between political

12   parties and major political parties have also recognized an

13   important state interest in making sure the only parties that

14   appear on the ballot are legitimate candidacies that can

15   demonstrate that sort of base-level support and can perform

16   the necessary steps if they were to actually prevail,

17   otherwise you are inundated with unserious candidates, and

18   Pennsylvania's courts have repeatedly said, have a legal

19   interest sufficient to not permit those types of candidacies

20   on the election -- or excuse me -- on the ballot.

21         So for all those reasons, I think there are three

22   clear ways in which the plaintiffs have failed to establish

23   that a federal court can enter relief this close to election

24   between the delay, the failure to establish it's feasible

25   without cost, confusion or hardship, and that the merits here

1    are not entirely clearcut, and, of course, the state courts

2    having now signaled at least three times that it's too late, I

3    think would be inappropriate, Your Honor, for a federal court

4    to second guess that.  Thank you.

5          THE COURT:  All right.  Thank you.

6          Mr. Haverstick, I'll give you the last word.

7          MR. HAVERSTICK:  Thank you, Your Honor.  Quickly, the

8    Klimer case to which counsel referred, that was a one-sentence

9    per curiam.  It's not precedential.  The case that supposedly

10   decided this issue in Pennsylvania, only from a precedential

11   standpoint goes to Commonwealth Court.  It was affirmed per

12   curiam in a one-sentence opinion by the Supreme Court, one

13   sentence per curiam order by the Supreme Court.

14         Let me address Purcell, because it's become I think a

15   great distraction, and I don't think its parameters are being

16   accurately communicated.

17         Purcell is not a one-stop shop to end election cases.

18   If it was, we wouldn't need to go through the test that we do

19   for a preliminary injunction or a TRO.  All they would have to

20   do is stand up and say, Oh, it's too close to the election.

21   There's nothing we can do about it.

22         Purcell makes clear that that case in that context is

23   about changes to rules.  It's about changing election rules

24   too close to an election because it's about confusion.

25         Kim does a good job of explaining that Purcell has to

1  be taken in the correct context, as you noted, a factor.  It's

2  something to think about.  Are we too close to the election

3  and will it cause confusion?

4         But I posit to the Court that we're not talking about

5  a rule.  We're talking about whether somebody can be on the

6  ballot, and I think it's less confusing for at least the

7  13,000 people who signed a petition to see Dr. West's name on

8  the ballot than to not see it on the ballot.

9         So Purcell's application is correctly cabined in this

10  case by Kim, which I think explains this is how you look at it

11  in context.

12         And then finally, let me talk about that context, and

13  I find it lacking in advocacy, particularly in election cases,

14  that there's not more plain speaking.  So I'm going to try to

15  speak clean, Your Honor.

16         You don't look at the individual aspects of the

17  requirements put on political bodies.  It is sort of abstract

18  separated terms.  The cases counsel, if you look at them sort

19  of collectively in the aggregate holistically, if you break

20  all of these requirements into their constituent parts, I'm

21  still not sure that they're not discriminatory, and they still

22  don't have anything to do with demonstrating the requisite

23  level support of a minor political party or a political body.

24  That's done by the petition process.  And in this case,

25  Dr. West got 8,000 more signatures than he was required to to

1    participate.

2       So the question here isn't about whether these rules

3    are designed to make sure that this is a legitimate

4    participant in the process. These are about electors, people

5    that nobody knows, nobody votes for, are not candidates, even

6    though they call them candidates, and it's being done to make

7    it hard for minor parties to be on the ballot. I wish the

8    department would just acknowledge that. It won't. It won't

9    ever say that, even though that's exactly what's going on here

10    and we all know it.

11       If there really was a good reason for electors to

12    have to sign candidate affidavits, then every single elector

13    for democrats and republicans would have to submit a candidate

14    affidavit.

15       If there was really a good reason why electors for a

16    political body had to pay money to be electors and democrats

17    and republican electors didn't, then they would have told us

18    what that good reason is.

19       If there really was a good reason why minor body

20    electors had to disaffiliate 30 days before they signed their

21    affidavits and republicans and democrats can be anything they

22    want, they don't have to be registered, they can be

23    republicans, they can be democrats, they can be libertarians,

24    greens, they could be whatever, they tell us what that good

25    reason is, and if there really was a good reason why a minor

1    party or political body had to identify, set in stone who its

2    electors were well in advance of even circulating petitions,

3    but democrats and republicans get an amazing amount of grace

4    period to run up close to the election before they actually

5    ever have to tell the department who their electors are, and

6    even then, they don't have to do it in a formal way -- as far

7    as I know, they can send an email to someone in the department

8    say here are the 19 electors, well, then they would have said

9    that.  But there is no good reason for any of those rules.

10   There's only one reason for those rules.  It is to make it

11   hard, as Dr. West said, to get around the duopoly, and we may

12   all -- you know, we may all think that's, I don't know, a good

13   thing.  I don't happen to think that it is, but you can't deny

14   that it's discriminatory, and you certainly can't deny that it

15   impinges on Dr. West's 1st Amendment and 14th Amendment

16   rights.

17        And let me leave you with this, Your Honor.  The

18   presentation from the Commonwealth today is about bureaucracy.

19   It's about, well, we do things a certain way in a certain

20   order, and we can't do it a certain way in a certain order

21   because if we do, it will cost money.  It's hard.  It's

22   confusing.

23        We are talking about people getting to vote for who

24   they want to.  We're talking about what an election actually

25   is there for.  It's for people to show up and, through voting

for people they want to vote for, express their ideas and what
they want from government and to have choice.  And when you
look at it in that context, I don't think, particularly given
the minimal thing that we're asking for today from this Court,
which is just to allow Dr. West to be on the ballot where it
is practicable and not onerous for him to do so.

When you look at it in the competing interest, the
Commonwealth having a very mechanical, orderly way of wanting
things done versus people, at least 13,000 of them in this
Commonwealth wanting to stand up and say, hey, neither of the
two major parties represent me.  I want to tell the world, the
voting public, whoever, my neighbor, that this is what I stand
for and this is who I stand for, then I don't think this
becomes and should become a hard decision for the Court.

We're asking for grace to allow, to the extent
possible, those 13,000, and maybe other people, to say, you
know what, I don't like either of the majors.  I want to vote
for somebody else.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.  All right.  Thank
you, everyone.  I appreciate it.  So just to wrap things up,
we'll have counsel file the joint stipulation of facts with
the exhibits.

Plaintiff's counsel file the declaration, and if
there's any objection, it sounds like there will be, we'll
have the defense file an objection to that declaration.

1          I think I'll give the parties an ability or I guess

2     an option to file any kind of supplemental brief of any kind

3     if they'd like.

4          Obviously time is short here, and so what I'm

5     thinking now would be if the plaintiffs want to file

6     something, they could file it by, you know, the end of today.

7     When I say "today," I mean midnight, and then if the defendant

8     wants to file some kind of a response, you know, by 5 p.m.

9     tomorrow.

10          And I will say the one thing that would be helpful,

11     at least from the plaintiff's standpoint, there was some

12     discussion here and argument portion of our proceeding here

13     today on the relief that's requested, you know, emails and

14     that sort of thing.  If there's any change to the relief that

15     was requested as part of the original motion for preliminary

16     injunction, submit a proposed order exactly what you're asking

17     me to do as part of the motion for a preliminary injunction,

18     and that way also the defense can respond to that precise

19     relief, that would be helpful for me.

20          Any questions on any of that or any issues anyone

21     wants to address here?  From the plaintiff's side?

22          MR. HAVERSTICK:  No.  Thank you for the time, Your

23     Honor.  We appreciate it.

24          THE COURT:  Thank you.

25          Defense?

1    MR. BOYER:  No, Your Honor.

2    THE COURT:  All right.  Thank you.  I appreciate it.

3    We'll get some orders out and we'll go from there.  Thank you.

4    THE DEPUTY CLERK:  All rise.  This Court is now

5    adjourned.

6    (The hearing concluded at 12:54 p.m.)

7    C E R T I F I C A T E

8    I, VERONICA R. TRETTEL, RMR, CRR, certify that
the foregoing is a correct transcript from the record of

9    proceedings in the above-entitled case.

10

11    \s\ Veronica R. Trettel_____          10/10/2024_____
VERONICA R. TRETTEL, RMR, CRR          Date of Certification

12    Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CORNEL WEST, et al., ) | |
| ) | 2:24-CV-1349 |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| PENNSYLVANIA DEPARTMENT ) | |
| OF STATE, et al., ) | |
| ) | |
| Defendants. ) | |

## <u>MEMORANDUM ORDER</u>

Dr. Cornel West seeks to run as a third-party candidate for President of the United States, and, with this lawsuit, seeks to gain access to the ballot in Pennsylvania. The Secretary of State has thus far denied him access, relying on a number of requirements in the election code that only apply to minor political parties or political bodies and that Dr. West has not met.

This Court has serious concerns with the Secretary's application of the election code's restrictions to Dr. West. The laws, as applied to him and based on the record before the Court, appear to be designed to restrict ballot access to him (and other non-major political candidates) for reasons that are not entirely weighty or tailored, and thus appear to run afoul of the U.S. Constitution.

That said, the Court has before it a motion requiring a balancing of the equities, which comes with it, a requirement to use some common sense. Common sense tells the Court that we are less than one month from a Presidential general election.[1] There is no time to re-print thousands of ballots and re-test the election

---

[1] *See Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) ("Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so.").

systems across all of 67 counties, without increasing the risk of error and confusion. Indeed, hundreds of thousands of mail-in ballots have already been cast, and so printing new mail-in ballots would unquestionably cause voter confusion, as well as likely post-election litigation about how to count votes cast by any newly printed mail-in ballots.  This is why the Supreme Court has reminded federal district judges that tinkering with the mechanics of a national election at a late stage is not a wise idea.[2] Based on the weighing of equitable principles, including those concerning election and voter confusion, the Court is constrained to deny Dr. West's motion.

## BACKGROUND

On September 25, 2024—41 days from the November 5, 2024, general election—Plaintiffs filed their complaint (ECF 1) and motion for a temporary re[s]training order and preliminary injunction (ECF 2).  Within, Plaintiffs Doctors Cornel West and Melina Abdullah—"Justice for All" party candidates for president and vice president, respectively—and Geraldine Tunstalle, Katherine Hopkins-Bot, and Charles Hier—registered Pennsylvania voters intending to vote for Doctors West and Abdullah—allege that Defendants Pennsylvania Department of State's and Secretary's interpretation of the Pennsylvania election code unconstitutionally infringes on their First Amendment and Fourteenth Amendment rights.  The result, Plaintiffs contend, is that Doctors West and Abdullah are prevented from gaining access to the ballot in Pennsylvania, and their aspiring voters are prevented from voting for their preferred candidates.

---

[2] *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) ("Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others.  It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.").

The harm Plaintiffs allege is real and undisputed.  Having failed to obtain affidavits for 19 disaffiliated presidential electors by the August 1, 2024, deadline, Doctors West and Abdullah will not appear on the ballot.  So Plaintiffs, and those associated with them, have turned to judicial intervention.  Some of their would-be electors began in Pennsylvania state court, but lost.  *Williams v. Pennsylvania Dep't of State*, No. 394 M.D. 2024, 2024 WL 3912684 (Pa. Commw. Ct. Aug. 23, 2024), *aff'd*, No. 25 WAP 2024, 2024 WL 4195131 (Pa. Sept. 16, 2024).  Plaintiffs (who tried but failed to intervene when that case was on appeal) have now taken up the mantle here in federal court.

The Court has received expedited briefing from the parties (ECF 20, ECF 21, ECF 30, ECF 32), as well as various exhibits and stipulations (ECF 29), and heard testimony and argument during an October 7, 2024, hearing.  ECF 26.  After careful review, the Court denies the motion.[3]

## DISCUSSION AND ANALYSIS

The Court begins with the threshold factors to obtain a preliminary injunction.  *Holland v. Rosen*, 895 F.3d 272, 285-86 (3d Cir. 2018) (describing factors).  First, the Court must find that Plaintiffs have established that their likelihood of success on the merits of their claims is "indisputably clear."  *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020).[4]  Assessing the merits requires application of the familiar *Anderson-Burdick* test.

---

[3] The Court considers the First Amendment and Fourteenth Amendment claims in conjunction.  *See The Const. Party of Pennsylvania v. Cortes*, 116 F. Supp. 3d 486, 498 (E.D. Pa. 2015), *aff'd sub nom. Const. Party of Pennsylvania v. Cortes*, 824 F.3d 386 (3d Cir. 2016) ("[I]n the ballot access context, freedom of association claims and equal protection claims are nearly identical.").

[4] Plaintiffs seek to change the status quo, and therefore seek a mandatory injunction.  *See, e.g.*, *Garrett v. Am. Fed'n of State, Cnty. & Mun. Emps. AFL-CIO*, No. 24CV1105, 2024 WL 1335186, at *3 (E.D. Pa. Mar. 28, 2024) (plaintiff seeking mandatory

Initially, the Court agrees with Plaintiffs that the very nature of the challenged laws precludes a finding that the burden is "minimal" such that rational-basis review applies. That is, Plaintiffs challenge election restrictions that are facially discriminatory, directed only to minor political parties and political bodies. Specifically, Plaintiffs claim that Defendants' characterization of presidential electors as "candidates" under Pennsylvania's election code creates a host of constitutional problems. That interpretation, Plaintiffs explain, means that minor political parties and political bodies must identify all 19 electors before submitting nominating papers (25 P.S. §§ 2911(a), 2912), that the presidential electors must be disaffiliated with any political party (25 P.S. § 2911.1), that presidential electors must complete affidavits (25 P.S. § 2911(e)), and that electors cannot be substituted unless Defendants first accept the nomination papers (*In re Scroggin*, 237 A.3d 1006, 1022-23 (Pa. 2020); 25 P.S. §§ 2940, 2941).[5] Plaintiffs claim that the two major political parties have no such restrictions, and there is no sound reason to treat the major parties so differently than minor parties.

As Defendants note, "[t]here are 'obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other,' that justify different paths to the ballot." ECF 20, p. 24 (quoting *Jenness v. Fortson*, 403 U.S. 431, 441 (1971)). That much is not in dispute. But "[a] burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on

---

injunction where he was seeking court order to enjoin prohibition on his running in election). That raises their burden.

[5] Defendants also mention in passing that the affidavit requirement triggers a filing fee for not only the presidential candidates but the presidential electors too, totaling $4,200 (25 P.S. § 2914). As the Court understands it, the major parties don't pay the elector fee.

associational choices protected by the First Amendment." *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983). The Court must therefore reject Defendants' argument that the laws present only minimal burdens warranting rational-basis review. *See Kim v. Hanlon*, 99 F.4th 140, 155 (3d Cir. 2024) ("If, however, the state's regulations just impose reasonable, ***nondiscriminatory restrictions*** we need only determine whether the state's legitimate interests are sufficient to outweigh the limited burden." (cleaned up) (emphasis added)); *see also Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 146 (3d Cir. 2022), *cert. denied sub nom. Mazo v. Way*, 144 S. Ct. 76 (2023) (law "impose[d] only a minimal burden" where the requirement was "***nondiscriminatory and applie[d] equally to all candidates and slogans***[;]" left "open ample and adequate alternatives for expression and association[;]" and the challengers "failed to provide evidence of any specific burden" (emphasis added)).

So, the question, then, is what is the level of scrutiny? On one hand, cases like *Kim* and *Mazo* suggest application of strict scrutiny. On the other hand, there is some support for applying something that looks like intermediate scrutiny. *Eakin v. Adams Cnty. Bd. of Elections*, 676 F. Supp. 3d 449, 459 (W.D. Pa. 2023) (Baxter, J.) (quoting *Daunt v. Benson*, 956 F.3d 396, 406-07 (6th Cir. 2020)); *see also Reform Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 174 F.3d 305, 314 (3d Cir. 1999) (requiring "the State's asserted regulatory interests [to] only be sufficiently weighty to justify the limitation imposed on the minor party's rights" (cleaned up)); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("[T]he mere fact that a State's system creates barriers tending to limit the field of candidates from which voters might choose does not of itself compel close scrutiny." (cleaned up)).

In the end, though, both standards are heightened and both require Defendants to put forward more weighty and specific interests that are, as applied to this case, furthered by the restrictions. On the record before the Court, the Court finds that the targeted burden of the laws on Plaintiffs is more than minimal, and

the Court further finds that Defendants' interests aren't, as applied, sufficiently weighty and logically connected or tailored to Plaintiffs' case.[6]  *See, e.g., Obama for Am. v. Husted*, 697 F.3d 423, 433-34 (6th Cir. 2012) (applying intermediate scrutiny and finding that the State failed to proffer sufficient evidence to support its interests other than vague assertions, and concluding that the "State has not shown that its regulatory interest in smooth election administration is 'important,' much less 'sufficiently weighty'").  As such, the Court finds that Plaintiffs are clearly likely to succeed on the merits, at least based on the present record.[7]

Plaintiffs have also met the second gateway injunction factor; they have unquestionably suffered irreparable harm, because the loss of First Amendment rights constitutes irreparable harm.  *See Kim*, 99 F.4th at 159; *see also Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 128 (3d Cir. 2023).

---

[6] By way of example, the disaffiliation requirement for affidavits (in conjunction with the similar "sore loser" requirement, 25 P.S. § 2911(e)(5)) is meant to prevent "sore losers" from the primaries from obtaining a second bite at the ballot and undermining the election process. *De La Fuente v. Cortes*, 751 F. App'x 269, 273-74 (3d Cir. 2018). But there is no evidence Doctors West or Abdullah are sore-primary losers. And, even if they were, that justification is attenuated when applying the disaffiliation requirement to presidential electors, as opposed to the actual candidates.  Maybe there are other weighty reasons for this restriction, but none have been sufficiently proffered or explained at this juncture, or supported by evidence.

[7] The Court recognizes that the Commonwealth Court recently held that the affidavit requirement was constitutional. *Clymer v. Schmidt*, No. 376 M.D. 2024, 2024 WL 3912661 (Pa. Commw. Ct. Aug. 23, 2024).  The court there, though, considered the restriction to be facially non-discriminatory, and so applied rational-basis review.  *Id.* at *13 (the court also examined only the affidavit requirement, and not the other requirements triggered by Defendants' interpretation of "candidate").  The Court, respectfully, disagrees that treating electors as "candidates" under the election code is non-discriminatory—it triggers requirements that apply to minor political parties and political bodies and not to the two major parties.

But after considering the two gateway factors, the Court must balance the remaining factors—harm to the public, the opposing parties, and third parties.[8]  In the election context, the *Purcell* principle is at issue.  That is, the Supreme Court "has repeatedly stated that federal courts ordinarily should not enjoin a state's election laws in the period close to an election[.]"  *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring); *see also Democratic Nat'l Comm. v. Wisconsin State Legislature*, 141 S. Ct. 28, 30 (2020) (Kavanaugh, J., concurring) (collecting cases).  "That principle . . . reflects a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled.  Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others."  *Merrill*, 142 S. Ct. at 880-81.

In *Kim v. Hanlon*, 99 F.4th 140 (3d Cir. 2024), the Third Circuit explained that "*Purcell* is a consideration, not a prohibition, and it is just one among other considerations specific to election cases that we must weigh for injunctive relief[,] . . . . in addition to the traditional considerations for injunctive relief."  *Id.* at 160 (cleaned up).  Examining the *Purcell* principle in this context, the Court concludes that it weighs strongly in favor of denying injunctive relief.  The Court makes three findings in this regard.

First, there is no question that the election is very close: less than one month away.  This proximity to the general election puts this case squarely within Supreme Court precedent.  *See Petteway v. Galveston Cnty., Texas*, 87 F.4th 721, 723 (5th Cir. 2023) (Oldham, J., concurring) (collecting cases and noting "[c]iting *Purcell*, the

---

[8] The Court consolidates its analysis of the last two factors because they "merge when the Government is the opposing party."  *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 205 (3d Cir. 2024) (*quoting Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Supreme Court refused to bless judicial intervention in State elections 21 days before the general election date, 34 days before the general election date, 46 days before the general election date, 48 days before the primary election date, 92 days before the primary election date, and 120 days before the primary election date" (cleaned up)). Indeed, the fact that the election has, in a sense, already begun via absentee/mail-in/over-the-counter voting suggests the principle applies with even more force.  *See Merrill*, 142 S. Ct. at 779 (Kavanaugh, J., concurring) (chastising District Court for declining to stay injunction "even though the primary elections [would] begin (***via absentee voting***) just seven weeks from [the date of the opinion]" (emphasis added); *accord New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020) (finding injunction violated *Purcell* principle, emphasizing "we are not on the eve of the election—we are in the middle of it, with absentee ballots already printed and mailed"); *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 227 (4th Cir. 2024) (noting district court "rightly heeded" *Purcell* where absentee ballots were distributed and in-person early voting had begun, explaining "[t]he election is not merely 'close' or even 'imminent'—it is happening right now" (cleaned up)).

Second, there is an actual risk of harm to Defendants and other election officials, as well as voters, if the injunction is granted.  During the October 7, 2024, hearing, the Deputy Secretary for Elections and Commissions for the Department of State testified that the county boards of election had mailed out over 1.1 million mail ballots, and voters had already returned over 137,000 mail ballots.  That number continues to grow.[9]

Plaintiffs recently modified their proposed order in what they say is an attempt at a compromise solution to lessen the burden on the counties.  Were the Court to

---

[9] Defendants represent in their latest filing that, a day later, the number of returned ballots jumped to over 217,000.  ECF 32, p. 5.

grant that order, Defendants would inform county officials that Doctors West and Abdullah are certified candidates and instruct them to place their names on ballots, replace printed paper ballots with corrected versions containing Doctors West and Abdullah, notify absentee or mail-in ballot recipients that have yet to return their ballots that Doctors West and Abdullah are candidates, and issue notices to be displayed at polling locations of the same.  ECF 30-1.  Assuming that the 67 counties can do these things in time (after the seven-day statutory challenge period, or even a truncated challenge period), what then?  With over hundreds of thousands of voters having already voted—using ballots without Doctors West and Abdullah listed—the remedy ensures voter confusion.

And the feasibility of this solution is at question.  At the hearing, the Deputy Director credibly warned that to print the ballots in time the counties may need to seek new, unvetted printing vendors, and would need to re-do logic-and-accuracy testing and ballot-acceptance testing on election equipment.  He stopped short of saying it was an "impossible" task, and the Court anticipates that it probably could be done.  But that would come at a cost; prudence exchanged for speed.  The Court is concerned about the errors such a rush risks creating,[10] and the potential blow to public confidence in Pennsylvania's election that risk engenders.  *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.").[11]  As a result, this

---

[10] The Deputy Director testified that problems could range from simple misspellings or ballot formatting errors to incorrectly recording votes, as happened during a North Hampton County judge election.

[11] The Court is also concerned such an order would result in a *Bush v. Gore* type of equal-protection problem when the counties count the ballots, *i.e.*, different ballots being used across different counties in a State-wide election resulting in different procedures or methods of counting. *See Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 387 (W.D. Pa. 2020) (Ranjan, J.) ("Indeed, *Bush's* core proposition—that a state may not take the votes of two voters, similarly situated in

could also chill voter participation. *See Kim*, 99 F.4th at 160 (noting "court orders affecting elections . . . can themselves result in . . . consequent incentive to remain away from the polls" (cleaned up)).

Third, the Pennsylvania Supreme Court—which this Court considers to be the institutional expert on election law in Pennsylvania—has already deemed it too late to alter the election mechanics. *New PA Project Educ. Fund v. Schmidt*, 112 MM 2024, 2024 WL 4410884, at *1 (Pa. Oct. 5, 2024) ("This Court will neither impose nor countenance substantial alterations to existing laws and procedures during the pendency of an ongoing election."); *see also Republican Nat'l Comm. v. Schmidt*, 108 MM 2024, 2024 WL 4406909 (Pa. Oct. 5, 2024) (Brobson, J., concurring) (same).

Plaintiffs offer two arguments in response to these considerations—neither of which is persuasive.

Plaintiffs' main response to the *Purcell* principle is that the principle is inapplicable because *Purcell* applies to "rules" and they "are not seeking any changes to 'rules[.]'" ECF 21, p. 6. That is too narrow an interpretation. "Courts have characterized many election-related provisions as 'election rules' subject to *Purcell*[,]" including things like injunctions imposing new congressional maps. *Tennessee Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Lee*, 105 F.4th 888, 897 (6th Cir. 2024) (citing *Robinson v. Callais*, 144 S. Ct. 1171 (2024)). Moreover, as part of their requested relief, Plaintiffs also ask that the Court change the rules as to an

---

all respects, and, for no good reason, count the vote of one but not the other—seems uncontroversial. It also seems reasonable (or at least defensible) that this proposition should be extended to situations where a state takes two equivalent votes and, for no good reason, adopts procedures that greatly increase the risk that one of them will not be counted—or perhaps gives more weight to one over the other.").

objections period for nominations.  So even under Plaintiffs' narrow reading of *Purcell*, the doctrine is implicated.  ECF 21, p. 11.[12]

Plaintiffs also point out that it isn't impossible for the counties to make changes now, and that it's just a matter of more money and manpower.  That's true, to some extent.  In fact, that's how it ought to be—if someone's constitutional rights are violated, the state and counties should figure it out.  But as the Court explained above, it isn't confident enough based on the record presented that all 67 counties will be able to implement the injunctive relief requested within the time parameters, without resulting in major errors.  That uncertainty is why the *Purcell* principle applies here.  *See Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring) (explaining that to implement injunction with election seven weeks away "would require heroic efforts by those state and local authorities in the next few weeks—and even heroic efforts likely would not be enough to avoid chaos and confusion").

As the Third Circuit recently explained, "[o]ne can assume for the sake of argument that aspects of the now-prevailing regime in Pennsylvania are unlawful as alleged and still recognize that, given the timing of Plaintiffs' request for injunctive relief, the electoral calendar was such that following it 'one last time' was the better of the choices available."  *Bognet v. Sec'y Commonwealth of Pennsylvania*, 980 F.3d 336, 363 (3d Cir. 2020), *cert. granted, judgment vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *see also Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 203 (3d Cir. 2024) ("[A]ny

---

[12] Plaintiffs also direct the Court to three cases for the proposition that *Purcell* is inapplicable here.  Two of them, *State ex rel. Peacock v. Latham*, 170 So. 475 (Fla. 1936), and *Johnston v. Ing*, 441 P.2d 138, 140 (Haw. 1968), pre-date *Purcell* by many decades.  The other, *Bryan v. Fawkes*, 61 V.I. 416 (V.I. 2014), is factually inapposite. *See Bryan*, 61 V.I. at 468 ("*Purcell* and its progeny—all of which involve an analysis of the four factors courts consider in issuing an injunction—are not relevant to this appeal.").

one factor may give a district court reason enough to exercise its sound discretion by denying an injunction.").  So too here.

In the end, if this case had been brought earlier, the result, at least on the present record, may have been different.  But the Court is constrained to balance all of the injunction factors, and in light of the balancing of particularly the *Purcell*-based factors, along with the traditional injunction factors, the Court finds that the equities require that it refrain from granting the relief requested.

### CONCLUSION

For the above reasons, the Court hereby **DENIES** Plaintiffs' motion for a temporary restraining order and preliminary injunction (ECF 2).

DATED this 10th day of October, 2024.


BY THE COURT:


/s/ *J. Nicholas Ranjan*
United States District Judge

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CORNEL WEST, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | 2:24-CV-1349 |
| | ) | |
| v. | ) | |
| | ) | |
| PENNSYLVANIA DEPARTMENT | ) | |
| OF STATE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM ORDER</u>

Before the Court is Plaintiffs' motion for injunction pending appeal. ECF 37. The Court has received expedited briefing in response from Defendants, ECF 40, so Plaintiffs' motion is ready for disposition. For the reasons discussed below, the Court denies the motion without prejudice.

"[T]he standard for obtaining a stay pending appeal is essentially the same as that for obtaining a preliminary injunction." *Conestoga Wood Specialities Corp. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. Feb. 8, 2013).

The discussion begins and ends with the likelihood-of-success factor. In arguing that a preliminary injunction is warranted, Plaintiffs re-state the same arguments the Court rejected a week ago. The Court declines Plaintiffs' invitation to reconsider its prior ruling, largely for the same reasons it articulated before. *See Cottillion v. United Ref. Co.*, No. 09-140E, 2014 WL 7344005, at *3 (W.D. Pa. Dec. 23, 2014) (Bissoon, J.) ("Mere repetition of arguments previously considered and rejected cannot be characterized as a 'strong showing' of a likelihood of success on the merits." (cleaned up)); *see also Fulton v. City of Philadelphia*, No. 18-2075, 2018 WL 11306951, at *1 n.1 (E.D. Pa. July 24, 2018) (incorporating by reference reasoning in memorandum opinion denying preliminary injunction where plaintiffs "rel[ied] on

the same arguments and the same evidence in support of their new motion for injunction pending appeal that [they] relied upon in support of their unsuccessful Injunction Motion").

More specifically, for Plaintiffs to obtain an injunction pending appeal, they must convince the Court that there is a "strong" chance that they will prevail on their appeal. *Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, 830 F. App'x 377, 389 (3d Cir. 2020) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). They cannot make that showing. For the reasons that the Court provided before, the public interest and harm to third parties, captured in the *Purcell* principle, make it likely that the Third Circuit will affirm this Court's prior order. The passing of another week only confirms the soundness of the Court's position.

That Plaintiffs have purportedly narrowed their requested relief doesn't change the Court's view. To begin with, it's unclear how the narrowed requested relief is materially different than the relief Plaintiffs originally requested. But even if there are some distinctions to be drawn, the same risks of voter confusion, error, and post-election counting disputes remain. The reality remains that re-printing several hundred thousand election-day ballots and conducting the appropriate testing in 67 counties with the election two weeks away carries too much risk.

**\* \* \* \***

For the above reasons, the Court hereby **DENIES** Plaintiffs' motion for an injunction pending appeal (ECF 37). This denial is without prejudice to Plaintiffs seeking an injunction pending appeal from the Third Circuit pursuant to Federal Rule of Appellate Procedure 8(a)(2).

DATED this 18th day of October, 2024.

BY THE COURT:

/s/ *J. Nicholas Ranjan*
United States District Judge

-2-